UNITED STATES of America

v.

Larry J. GRAY, Appellant.

No. 71–1430.

United States Court of Appeals,
Third Circuit.

Argued Dec. 2, 1971.

Reargued en Banc June 21, 1972.

Decided Oct. 3, 1972.

—————◆—————

John Rogers Carroll, Philadelphia, Pa.,
for appellant.

Walter S. Batty, Jr., Asst. U. S. Atty.,
Philadelphia, Pa., for appellee.

Argued Dec. 2, 1971.

Before SEITZ, Chief Judge, and KALODNER and GIBBONS, Circuit Judges.

Reargued en Banc June 21, 1972.

Before SEITZ, Chief Judge, and KALODNER, VAN DUSEN, ADAMS, GIBBONS, MAX ROSENN, JAMES ROSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

This is an appeal by the defendant Larry J. Gray from a judgment of conviction pursuant to a jury verdict finding him guilty of bank robbery in violation of 18 U.S.C.A. § 2113(a) and (b).

Gray contends that prejudicial errors were committed in his trial when the prosecutor, in cross-examination, asked him this question: "You say your wife was killed. You killed her, didn't you?", and when the government, in its case-in-chief, adduced testimony that Gray had suffered prior imprisonment.

Gray does not contend that the trial evidence was insufficient to sustain his conviction. Nor does he now press an initial contention that the trial judge erred in refusing to grant him a requested instruction on identification. We find no error in the identification instruction given to the jury by the trial judge.

The testimony relevant to our disposition may be summarized as follows:

About 11:30 a. m., June 17, 1968, the Fidelity Bank branch at 16th Street and John F. Kennedy Boulevard, Philadelphia, Pennsylvania, was robbed of $380.-00 cash. A paying teller gave the money to the robber after he had handed her a penned threatening note demanding "a handful of 20 dollar bills." Gray was indicted on October 22, 1970. He was tried to a jury in January 1971. He was sentenced to a 10-year prison term.

Gray was identified as the hold up man by the paying teller who was robbed.

Several other bank employees were unable to identify him, saying only that he resembled the hold up man.

A handwriting expert employed by the Federal Bureau of Investigation testified that Gray had written the hold up note used in the robbery, basing his opinion on his comparison of the note with handwriting and hand printing samples obtained from Gray. In order to establish the chain of possession of the handwriting samples, the government adduced the testimony of FBI Agent Schwein who had obtained them. Schwein testified that he had obtained two sets of samples, the first set on October 9, 1969, and the second set several days later.

After Schwein had testified that he had made "initial contact" with Gray on October 9, 1969, the prosecutor asked him "[w]here?" and the answer was "[a]t Holmesburg Prison." Gray's counsel did not object to the question nor did he move to strike the answer. Schwein further testified that after the FBI laboratory at Washington had requested additional samples, *"I went back to the prison"* and obtained them from Gray. (emphasis supplied). There was no objection to this latter testimony.

Gray took the stand in his own behalf. He presented an alibi defense, testifying that he was at work on the day and at the hour the bank robbery took place.

Seeking to cast doubt on the identification testimony of the paying teller who had described the robber as weighing about 150 pounds and wearing glasses, Gray said that at the time of the robbery in June 1968 he weighed 175 pounds and he did not wear glasses. He testified that he did not acquire glasses until March 1970 when "I had trouble reading in Holmesburg Prison while I was locked up waiting trial on my wife's death," and that "after my wife was killed, I lost quite a bit of weight."

It was at this point in Gray's testimony that the prosecutor asked him the question:

"You say your wife was killed. You killed her, didn't you?"

Defense counsel objected to the question; the prosecutor, in reply, said it was asked in an attack on Gray's credibility.

The jury was then excused. As later detailed, the trial judge severely criticized the prosecutor for asking the challenged question. The prosecutor said he had "a right" to impeach Gray's credibility by establishing his felony conviction for the voluntary manslaughter of his wife, and his conviction for robbery. In an ensuing discussion, it was developed that Gray had been convicted in July 1970, for the voluntary manslaughter of his wife in September 1969, some 15 months after the June 1968 robbery here involved. Defense counsel moved for a mistrial at this time and it was denied. The trial judge ruled, however, that the prosecutor could not question Gray with respect to any prior record.

The jury was then recalled to the courtroom and instructed as follows by the trial judge:

"Members of the jury, for reasons which are of no importance to you at this time, whatever testimony you have heard, and it is very little, just a few questions, regarding the death of Mr. Gray's wife, *just ignore that, strike it from your minds entirely.* When you consider this case and deliberate *just force it out. Pay no attention to it whatsoever.*" (italics supplied).

After Gray was found guilty he filed a motion for a new trial. In it he contended, *inter alia*, that the question "You say your wife was killed. You killed her, didn't you?" was under the circumstances so inherently prejudicial that the trial judge erred in denying his trial motion for a mistrial.

The trial judge denied the motion for a new trial.

In doing so he said in relevant part:

"While we believe that the phrasing of the question was improper, we do not believe that the defendant was prejudiced by it. . . . Considering the magnitude of the evidence against defendant, it, if error at all, was harmless beyond a reasonable doubt."

It must be noted, parenthetically, that the trial judge, in his Opinion denying Gray's motion for a new trial, did not rely on, nor advert to, his cautionary instruction to the jury to "ignore" the prosecutor's challenged question anent Gray's killing of his wife.

We are of the opinion that the trial judge erred in denying Gray's motion for a new trial for these reasons:

"You say your wife was killed. You killed her, didn't you?"

That question, put to the defendant by the prosecutor in this robbery trial was grievous plain error, and the trial judge compounded it when he failed to declare a mistrial on the defendant's trial motion.

That the trial judge at the time was aware of the prejudicial dimension of the prosecutor's question, and his duty to declare a mistrial by reason of it, is demonstrated by his own statements. He then said:

"*Frankly, this is beyond belief. . . I think it is highly prejudicial. I am going to tell the jury to disregard that question. . . . I should declare a mistrial, I think, but I won't. . . . [W]hen you say to a witness 'you killed your wife', that is about the strongest thing I have heard in a court room in many years.*" (italics supplied).

Wife murder is an atrocious crime, revolting and abhorrent to the conscience of our society. No cautionary instruction could purge the jury's mind and memory of the devastating impact of the question "You say your wife was killed. You killed her, didn't you?" The question irretrievably seared itself into the conscious and subconscious minds of the

jury. The most valiant striving on the part of a conscientious juror to comply with the trial judge's admonition to "strike it from your minds entirely"; "just force it out"; "pay no attention to it whatsoever"; could in the case of some jurors only be an exercise in futility. To hold that the cautionary instruction was an effective detergent which completely laundered out of the jury's mind the impact of the prosecutor's question, is unrealistic and little less than fantasmagoria. A trial judge can "strike" evidence from notes of testimony; it is something else again to "strike" its searing impress from a juror's mind. Apt here, are these immortal lines:

> "The Moving Finger writes; and, having writ, Moves on: nor all your Piety nor Wit, Shall lure it back to cancel half a Line, Nor all your Tears wash out a Word of it." Rubáiyát, Stanza 71.

The Supreme Court has held that cautionary admonitions of a trial judge are ineffective to erase from the minds of a jury the effects of prejudicial testimony. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton*, the Court, at page 129, quoted the following statement in Mr. Justice Jackson's concurrence in Krulewitch v. United States, 336 U.S. 440, at page 453, 69 S.Ct. 716, at page 723, 93 L.Ed. 790 (1949):

> "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . ." (footnote omitted).

In United States v. Clarke, 343 F.2d 90 (3 Cir. 1965), we held that instructions to a jury to disregard inadmissible prejudicial testimony could not operate to cure the error of its introduction. Other Circuits are in accord. United States v. Nemeth, 430 F.2d 704, 706 (6 Cir. 1970); United States v. Rudolph, 403 F.2d 805, 807 (6 Cir. 1968); Maestas v. United States, 341 F.2d 493, 495–496 (10 Cir. 1965); Mora v. United States, 190 F.2d 749, 752–753 (5 Cir. 1951).

In holding that a cautionary instruction does not cure prejudice, Chief Judge Weick, speaking for the Court in United States v. Rudolph, *supra*, said:

> "It must be remembered that after the saber thrust, the withdrawal of the saber still leaves the wound." (italics supplied).

In *Maestas*, the Court said (341 F.2d p. 496):

> ". . . where the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered."

This, too, must be said with respect to the second point presented by the defendant on this appeal:

In the government's case-in-chief, FBI Agent Schwein twice testified that Gray was in jail when he obtained from him specimens of his handwriting for the purpose of comparing them with the penmanship on the hold-up note used in the robbery.

It is well-settled that the government may not, in its case-in-chief, adduce testimony of a defendant's imprisonment.

In Michelson v. United States, 335 U.S. 469, p. 475, 69 S.Ct. 213, p. 218, 93 L.Ed. 168 (1948), the Court said:

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, Greer v. United States, 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469, *but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts,*

*or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime."* (footnotes omitted) (italics supplied).
To the same effect see United States v. Nemeth, *supra*; Smith v. Rhay, 419 F. 2d 160, 164 (9 Cir. 1969).

Exhaustive research has failed to yield any case in which it was held permissible for the government to develop in its *case-in-chief* a defendant's prior criminal record.

■■ The circumstance that the defendant failed to object to the government's evidence in its case-in-chief as to his imprisonment is irrelevant in light of the fact that it was "plain error," and it is settled that an appellate court will take notice of "plain error" in spite of lack of proper objection below. Silber v. United States, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962); Government of the Virgin Islands v. Smith, 445 F.2d 1089 (3 Cir. 1971). Moreover, Rule 52(b) F.R.Crim.P. provides:

"*Plain error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Singularly relevant here is what this court, speaking through Judge Hastie, said in United States v. Jacangelo, 281 F.2d 574, pp. 576–577 (1960):

". . . [T]he evidence of involvement in other crimes was intrinsically inadmissible as highly prejudicial information about a collateral matter not connected with the offense charged. Brown v. United States, 3 Cir., 1936, 83 F.2d 383; Helton v. United States, 5 Cir., 1955, 221 F.2d 338. . . . To inform the jury of prior crimes of a defendant is, in the view of the Supreme Court, so improper and so prejudicial that a mistrial must be declared, even when the jurors as-

sert that they can and will disregard that information. Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250."

Standing alone, and independently, the "plain error" committed when the prosecutor asked Gray "You say your wife was killed. You killed her, didn't you?", and the "plain error" committed when the government in its case-in-chief introduced evidence of Gray's prior imprisonment, compel reversal of the judgment of sentence and remand for a new trial.

■ Since we are remanding for a new trial we are required to consider Gray's further contention that his manslaughter conviction cannot be used for impeachment purposes because the manslaughter offense was committed in September 1969—15 months *after* the robbery offense on trial.

Gray cites the holding of the Supreme Court of Pennsylvania that the admission of a defendant's conviction for offenses committed *after* the date of the crime for which he is on trial constitutes prejudicial error. Commonwealth v. McIntyre, 417 Pa. 415, 208 A.2d 257 (1965).

We do not subscribe to the stated holding in *McIntyre.* When a defendant chooses to testify in his own behalf his credibility as a witness *as of that time* is at stake. Accordingly, the prosecution may, for impeachment purposes, *then* question him with respect to his prior conviction of a felony or misdemeanor in the nature of *crimen falsi.*

We note Gray's further contention that, independent of the foregoing considerations, it was impermissible for the government to make use of his voluntary manslaughter conviction for impeachment purposes because, he says, such a crime does not reflect on veracity. He cites in support decisions of the Second and District of Columbia Circuits,[1]

1. United States v. Puco, 453 F.2d 539, 543 (2 Cir. 1971); Jones v. United States, 131 U.S.App.D.C. 88, 402 F.2d 639, 643–644 (1968); Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936, 940 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968); Brown v. United States, 125 U.S.App.D.C. 220, 370 F.2d 242, 245 (1966).

which have limited use of prior convictions for impeachment purposes to crimes involving fraud or stealing, and further ruled that violent or assaultive crimes do not reflect on veracity.[2]

The rule has long been established in this Circuit that a conviction which may be used to impeach a witness must be of a crime which is a felony *or a* misdemeanor amounting to *crimen falsi,* viz., dishonesty or falsehood. United States v. Mitchell, 427 F.2d 644, 647 (1970); United States v. Evans, 398 F.2d 159, 164–165 (1968).

Gray urges, in substance, that we extend the "dishonesty or falsehood" test to a felony conviction.

In light of our disposition of the instant appeal, we see no compelling need to now decide whether the "dishonesty or falsehood" test should be extended to a felony conviction.

There remains this to be said with respect to Judge Gibbons' dissenting opinion:

The crux of the dissent is that while the prosecutor's question "You say your wife was killed. You killed her, didn't you?" was "objectionable," it was "at most, harmless error" in light of the "fairly overwhelming proof of guilt," and, because "the Government could, by asking the proper question, have established Gray's conviction for manslaughter of his wife."

Assuming that under our prior rulings the government, for impeachment purposes, could have asked Gray, when he took the stand, whether. he had been convicted of the crime of voluntary manslaughter, the question "You say your wife was killed. You killed her, didn't

you?" was prejudicial under United States v. Mitchell, 427 F.2d 644 (3 Cir. 1970).

We there (p. 647) held that "[t]he prosecution is limited to establishing the number of convictions, the nature of the crimes, and the time and date of each, and *may not elicit information solely to prejudice the defendant . . .*" and that "[c]ourts are aware of the prejudicial nature of all evidence of prior convictions, and *where the prosecution goes beyond the essential facts of the convictions a reversal may be required,* although counsel does not object." (italics supplied).

Here, the "You say your wife was killed. You killed her, didn't you?" question undisputably transgressed the permissible limits of questioning as to prior convictions.

We squarely rejected in United States v. Silver, 457 F.2d 1217 (3 Cir. 1972), the view that "fairly overwhelming proof of guilt" is a dispositive factor in determining whether a defendant has been accorded a fair trial. We there said at pages 1222 and 1223:

"The circumstance of guilt however is not the dispositive factor in weighing the issue whether a defendant has been accorded a fair trial. Appellate courts are not law enforcement agents. Their function is to determine only whether a defendant has been fairly tried in accordance with due process requirements; just that and nothing more, nothing less. . . .

"In Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), it was squarely held that upon a review of a conviction in the federal

2. Rule 106(1)(b) of the American Law Institute Model Code of Evidence and Rule 21 of the Uniform Rules of Evidence make inadmissible for impeachment purposes evidence of conviction of a crime "not involving dishonesty or false statement." However, Rule 609(a) of the Revised Draft of Proposed Rules of Evidence for United States Courts and Magistrates (March 1971), 51 F.R.D. 315, 391, provides, in part, that where

there has been a conviction for a crime *"punishable by death or imprisonment in excess of one year"* evidence of such conviction may be introduced for the purpose of attacking credibility of a witness, *"unless . . . the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice."* (italics supplied).

courts, the question is not whether guilt may be spelt out of the record, but *whether guilt has been found by the jury according to the procedure and standards appropriate for criminal trials in the federal courts.* In so holding, the Court said (p. 615, 66 S. Ct. p. 406):

'In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be.' "

The judgment of conviction and sentence will be reversed and the cause remanded to the District Court with directions to grant a new trial and to proceed in accordance with this Opinion.

ADAMS, Circuit Judge, concurs in the result reached by this Opinion.

GIBBONS, Circuit Judge, with whom SEITZ, Chief Judge, and JAMES ROSEN, Circuit Judge, join, dissenting.

The heart of Judge Kalodner's opinion for the Court is the language:

"Wife murder is an atrocious crime, revolting and abhorrent to the conscience of our society. No cautionary instruction could purge the jury's mind and memory of the devastating impact of the question 'You say your wife was killed. You killed her, didn't you?' The question irretrievably seared itself into the conscious and subconscious minds of the jury."

As is often the case, the reviewer of the drama of United States v. Larry J. Gray has injected far more drama into the review than may be found in the script. The judges who join in the majority were not present to observe the irretrievably searing effect of the prosecutor's question. The trial judge was present, observed the demeanor and inflection of the prosecutor and the witness, and the reac-

tions of the jurors. Yet from carefully selected and isolated portions of the printed record the majority concludes that the prosecutor's question "irretrievably seared itself into the conscious and subconscious minds of the jury." On the record as a whole, I see no reason whatsoever to conclude that in denying a motion for a mistrial the trial judge, on the scene, abused his discretion. Appellate courts should not substitute dramatic description or poetic license for reasoned analysis. Reasoned analysis, I suggest, requires an affirmance in this case.

At the trial Gray was positively identified by the teller who had been the victim of the holdup. Other witnesses testified that Gray resembled the holdup man. A handwriting expert employed by the Federal Bureau of Investigation testified that Gray had written the holdup note which was used in the commission of the robbery. In the Government's case an agent of the Federal Bureau of Investigation, in order to establish the authenticity and chain of possession of handwriting samples to which the expert made comparisons, testified without objection that he obtained them from Gray at Holmesburg Prison. There was no offer by the defendant to stipulate to the authenticity and chain of possession of these samples. There was no testimony at this point about the reason for Gray's incarceration in Holmesburg. There was nothing more than the establishment, without objection, of the time and place of obtaining the samples. The majority opinion describes this as "plain error" within the meaning of Rule 52(b), Fed.R.Crim.P. If, when on retrial of this case, the defendant declines to stipulate and the Government seeks to establish the authenticity and chain of possession of the samples the trial court, forewarned by the majority opinion, will undoubtedly rule that it is sufficient for the F.B.I. agent to answer the questions "from whom and when did you obtain the samples", rather than the questions "from whom, when and where." But to say that in the first trial the district court committed plain error, when the de-

fendant made no offer to stipulate respecting the samples, although he knew very well they were obtained from him while he was imprisoned, is to require a degree of foresight by trial judges far greater than can be anticipated from mere mortals. The question sought relevant evidence, and the ability to guard against possible collateral prejudice from the admission of that evidence lay primarily within the control of the defendant.

Gray's defense was alibi. He took the stand to establish that alibi and to contest the Government's identification evidence. Up to the time he took the stand there was no testimony as to the reason for his incarceration in Holmesburg Prison. In fact, however, he was being held on a murder charge growing out of his wife's death. In order to cast doubt upon the identification testimony of a government witness, Gray denied that on June 17, 1968, the date of the robbery, he wore glasses. He then testified:

"Q. Do you have glasses now?

A. Yes, sir, I have glasses now.

Q. Now, when Mrs. Lindsay was in the courtroom you produced a pair of glasses. Do you have them with you?

A. Yes.

Q. Would you take them out and show them to us? Hold them up.

A. (Indicates)

Q. Where did they come from? Where did you get those?

A. I had trouble reading in Holmesburg Prison while I was locked up waiting trial on my wife's death.

\* \* \* \* \* \*

Q. When was that?

A. Around January of '69.

\* \* \* \* \* \*

Q. You did not have these glasses in 1968?

A. No, I did not have these glasses in 1968."

Gray also challenged the testimony of the government identification witness concerning his weight. Gray claimed that he always weighed 174 to 175 pounds rather than the 157 pounds which the witness described. On cross examination the Government inquired whether in September 1969 Gray weighed 157 pounds. At that time Gray was in Holmesburg Prison. He answered:

"A. Well, let me see, there was one period there after my wife was killed, I lost quite a lot of weight. Well, not before she was killed, but when I was locked up from March 31, June, July, August, three months I was locked up. I lost quite a bit of weight at that time, at that period.

\* \* \* \* \* \*

Q. So what you said earlier, that you were always 174 or 175 pounds, wasn't quite correct?

A. It was under ordinary circumstances. Those were very extraordinary circumstances. I was in a lot of mental anguish at the time.

Q. So in 1968 you could have weighed 157 pounds, too, couldn't you, in June, June 17?

A. No, no.

Q. In other words, you lost 17 pounds between June, '68 and September, '69?

A. Well, that could be checked from the official files of the Budd plant, because I get weighed there.

Q. You say your wife was killed, you killed her, didn't you?"

As Judge Kalodner's opinion points out, the last question was objected to and the jury was removed from the courtroom. The Assistant United States Attorney represented that Gray had in fact been found guilty of the voluntary manslaughter of his wife and had been sentenced. He proposed to establish this conviction and a conviction for robbery. A defense motion for a mistrial was denied, and the trial court gave the cautionary instruction which, with editorial emphasis, Judge Kalodner's opinion quotes. After Gray was found guilty he made a motion

for a new trial on the ground, among others, that the question "You say your wife was killed, you killed her, didn't you?" was in the circumstances so inherently prejudicial that a mistrial was required. The trial court denied this motion, finding specifically that considering the magnitude of the evidence against the defendant, if the use of the question by the Assistant United States Attorney was error at all, it was harmless beyond a reasonable doubt. The majority completely disregards that finding and substitutes its own finding that the question "irretrievably seared itself into the conscious and subconscious minds of the jury."

The "searing" question came at a point in the trial when, in an effort to cast doubt on the Government's identification testimony, Gray had twice in his own testimony made reference to his incarceration awaiting trial because of his wife's death. The trial judge was in a position to observe the effect on the jury of Gray's self-servicing references to his incarceration, and the effect, if any, on the jury of the prosecutor's cumulative question. The trial judge observed the effect of his cautionary instruction. Substitution for his finding that the question was harmless beyond a reasonable doubt of an appellate court finding that the question "irretrievably seared itself into the conscious and subconscious minds of the jury" is both poor appellate practice and poor amateur psychiatry. At best both the appellate court and the trial court are speculating as to what actually "seared" the minds of the jury. The trial court at least had the benefit of the opportunity for direct observation.

The form of the question asked by the Assistant United States Attorney was objectionable. Yet, for impeachment purposes the Government in the district courts in this circuit ordinarily may establish that the witness has been convicted of a felony or misdemeanor

amounting to *crimen falsi*. United States v. Mitchell, 427 F.2d 644, 647 (3d Cir. 1970); United States v. Evans, 398 F.2d 159, 164 (3d Cir. 1968); United States v. Montgomery, 126 F.2d 151, 155 (3d Cir.), cert. denied, 316 U.S. 681, 62 S.Ct. 1268, 86 L.Ed. 1754 (1942). Gray was not asked about a crime for which he had not been convicted. *Cf.* United States v. Nettl, 121 F.2d 927 (3d Cir. 1941). Thus, for impeachment purposes, at the time of the trial of this case, the Government could, by asking the proper question, have established Gray's conviction for manslaughter. Indeed the majority acknowledges as much.

Here, I submit, is where the analytical inadequacy of the majority opinions is most apparent. As the transcript reveals,[1] the objection by defense counsel to any reference to the manslaughter conviction was based on his assumption that the federal courts should follow the rule of Commonwealth v. McIntyre, 417 Pa. 415, 208 A.2d 257 (1965). The majority declines to subscribe to the *McIntyre* rule for the good reason that it is unsound. It remands the case for a retrial in which the prosecutor will be permitted to establish what he was not permitted to establish in the original trial—that the defendant had been convicted of voluntary manslaughter. Thus the difference between this case and the case that will be presented on retrial is solely in the form of the prosecutor's question. This is claimed to be such fundamental error as to require a mistrial, even though the prosecutor's reference to the defendant's wife was merely cumulative of the defendant's own prior volunteered reference to the fact he had killed her. That the Court which found harmless error in United States v. Mitchell, 427 F.2d 644 (3d Cir. 1970), and which affirmed in United States v. DeCarlo, 458 F.2d 358 (3d Cir. 1972), should find such plain error here as to have required a mistrial is puzzling indeed. A district court judge

1. The objection was stated:
"I want to remind the Court that I would agree to some extent to prior, but the killing took place in '69 and the conviction in '70. This is subsequent. It has no bearing at all on what happened in '68, Your Honor." (Transcript at 17).

ruling on objections to evidence or to the form of questions or on mistrial motions, contrasting the three decisions can only conclude that what is so prejudicial as to require a mistrial will depend upon the visceral reaction of a majority of this Court; a visceral reaction having no foundation in empirical evidence about how jurors react to one type of question rather than another.

Judge Kalodner argues:

"To hold that the cautionary instruction was an effective detergent which completely laundered out of the jury's mind the impact of the prosecutor's question, is unrealistic and a little less than fantasmagoria. A trial judge can 'strike' evidence from notes of testimony; it is something else again to 'strike' its searing impress from a juror's mind."

This is a misstatement of the issue. The rules permitting correcting, limiting, and cautionary instructions are not based on the assumption that jurors will forget, but on the assumption that by and large they will follow the court's instructions, and on the necessities of an adversary fact finding process conducted by human beings. The harmless error rule is a recognition that mere mortals cannot be expected in every instance to conduct a "perfect" trial. Although some of the sweeping language in the majority opinions might suggest it, I do not read them as holding that cautionary instructions can never cure a trial error. Thus in ruling on mistrial motions district court judges will continue to be called upon to exercise subjective judgments based upon their overall impression of the impact of the given imperfection. When this court undertakes, without the benefit of direct observation, from the cold record, to draw so fine a line as has been drawn by the majority, between what was harmful and what on retrial will not be harmful, it merely substitutes its subjective judgment for that of the judge responsi-

ble for conduct of the trial. It does so in this case despite the finding by the district court that the impact of the question was harmless beyond a reasonable doubt.[2] Rejection of that finding does not seem to me an appropriate exercise of appellate jurisdiction.

If the majority opinions proposed the anticipatory adoption of Rule 609(a) of the Revised Draft of Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 391, (March 1971), they would at least have the virtue of reasoned analysis in place of subjective reaction. I would not vote to adopt that rule now, while the Draft is still under consideration, especially at the cost of a reversal and a new trial on a record containing fairly overwhelming proof of guilt and, at most, harmless error. *Cf.* United States v. Fiorvanti, 412 F.2d 407, 415, (3d Cir.), cert. denied, Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

---

2. In view of that finding the majority makes far too much of the district court's initial reaction to the question. "Frankly, this is beyond belief. . . ." The trial judge knew, better than we can ever know, when his own expression out of the presence of the jury was hyperbolic.