UNITED STATES of America

v.

Michael YOUNGBLOOD a/k/a
"Michael Williams"

No. CRIM. A. 99–1.

United States District Court,
E.D. Pennsylvania.

May 11, 1999.

*MEMORANDUM*

BARTLE, District Judge.

On April 1, 1999, after a four day jury trial, defendant Michael Youngblood, also known as Michael Williams, was convicted of thirty-four counts of extortion, bank fraud, tax evasion, and failure to file tax returns. He was acquitted on one count of failing to file a federal income tax return. Presently before the court is the defendant's motion for a new trial based on juror misconduct.

The charges, in large part, arose out of the defendant's involvement, in 1996 and 1997, in the construction of a homeless shelter in Philadelphia known as Deliverance Center of Hope—II, a project of the Deliverance Center of Hope, Inc., a non-profit corporation affiliated with the Deliverance Evangelistic Church. In an agreement formed in 1995 and 1996 with the non-profit corporation, the City of Philadelphia (the "City") had agreed to provide $850,000 for the project. This sum was thought to be the amount needed to complete the renovations and run the shelter for a few months.

The defendant was the long-time personal aide to Philadelphia Councilwoman Jannie Blackwell. With the tacit acquiescence of city officials, he assumed the role of de facto general contractor at the shelter construction site. He hired and fired the contractors, submitted their invoices to the Deliverance Center of Hope, Inc. for payment, and delivered the checks to pay the workers and contractors. He was the one who told the non-profit corporation what checks to write on the funds supplied by the City. As time went on, the project began to suffer delays and expenses began greatly to exceed the budget. Finally, when the City stopped the funding, the project came to a halt. The City had spent approximately $1.7 million, and the project was never completed. The jury found, based on overwhelming evidence, that the defendant had extorted money from various contractors he brought onto

Donald M. Padova, Philadelphia, PA, for Michael Youngblood a/k/a Michael Williams, Defendant.

Timothy R. Rice, U.S. Attorney's Office, Philadelphia, PA, for U.S.

the job and that he had fraudulently endorsed checks.

The tax charges against the defendant covered the years 1993 through 1997. The defendant had joined the City of Philadelphia payroll in June, 1992, working as an aide to Councilwoman Jannie Blackwell, but was fired by the City in February, 1993. By agreement between the parties, no evidence was offered regarding the reason for his termination in 1993. After his termination, the defendant continued to work for Councilwoman Blackwell, who paid him out of her own salary. He also received a salary for his work at the Deliverance Center of Hope—II, as well as the extorted money and the amounts of the forged checks. The jury found that he failed to file returns in 1994 through 1997 and that he evaded taxes for the years 1996 and 1997. Again, on the counts for which he was convicted, there was a plethora of evidence.

The trial attracted extensive media attention. Articles about the defendant and the case appeared in Philadelphia's newspapers, the *Philadelphia Daily News* and *The Philadelphia Inquirer*, before, during, and after the trial. There were also reports about the case on television. During voir dire, prospective jurors were asked whether they had heard anything about the case or knew anything about the defendant. Juror No. 2 was silent on this subject during the jury selection process. It was not until he was empaneled that he indicated he knew anything about the case. Before the testimony began, he was called to sidebar. He told the court and the attorneys that he did not want to serve and that he already knew about the case. When he was asked what, specifically, he knew, he said only that he was present in City Hall the day the defendant was indicted. He assured the court that, despite this knowledge, he could be fair and impartial and decide the case solely on the evidence presented at trial. While the government requested that the juror be dismissed, defense counsel objected. We declined to dismiss Juror No. 2.

Prior to the receipt of any evidence, the jurors took an oath, swearing that "[they] will well and truly try the issue joined in this indictment between the United States of America and defendant Michael Youngblood, also known as Michael Williams, and that [they] will a true verdict render according to the evidence, so help [them] God . . ." We then gave the jury preliminary instructions. We explained, "Anything you may see or hear outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom." We also charged that during the trial jurors were not to discuss the case among themselves or with anyone else, they were not to try, in any way, to learn anything about the case outside the courtroom, and they were not to read about the case in the newspaper or to listen to radio or television reports about it.

At the beginning of the fourth and last day of trial, defense counsel brought it to the court's attention that the day's *Philadelphia Daily News* featured a full-page photograph of the defendant on its cover, along with several articles about him inside. The court asked the jurors whether any of them had seen the paper. Those who answered in the affirmative were brought to sidebar for further questioning. Although they confirmed that they had seen the cover, none of them had read the articles. Neither the government nor the defense requested that any of the jurors be excused. The court then repeated to the entire jury its instruction that the jurors were to avoid any news coverage relating to the case and that they were to decide the case solely based upon the evidence admitted at trial. Finally, before the jury retired to deliberate, the court again directed the jury to decide the case on the evidence presented.

On April 1, the jury returned with its verdict of guilty on twelve counts of extor-

tion, sixteen counts of bank fraud, two counts of tax evasion, and four counts of failure to file an income tax return. It found defendant not guilty on one count, charging failure to file a tax return for the year 1993.

One week later, the defendant filed a motion for an order directing the Court Clerk to provide the defense with the names and addresses of jurors. In support of the motion, defense counsel reported that after the verdict, one of the jurors had approached him with the following information:

> that the other jurors had their decision made prior to deliberation .... that a number of the jurors based their verdict on the "character" of the defendant .... that one of the other jurors informed the rest that the defendant was a founder of the Junior Black Mafia and [stated] "what else could you expect" .... [and] that other jurors knew more about the case and the defendant then [sic] they disclosed to the Court.

The government opposed the request for the jurors' names and addresses. It argued that any questioning of jurors must be conducted on-the-record by the court in the presence of all parties.

During phone conferences with the court on April 9, counsel agreed that the court should conduct a further inquiry. The court proposed calling in four of the twelve jurors, including Juror No. 2, the one who made the remarks to defense counsel, Juror No. 1, who was the foreperson, and two others randomly selected. Neither counsel objected to the proposal. Both sides were invited to submit proposed questions. We scheduled the hearing for April 15, 1999. The court then issued orders directing Jurors Nos. 1 and 2, and the two randomly selected jurors, Nos. 4 and 7, to appear for the hearing.

On April 15, each of the four jurors was questioned in open court, but outside the presence of one another. Juror No. 2, who had made the initial comments to defense counsel, told the court that no juror had mentioned anything about the Junior Black Mafia or the defendant's purported connection with the Junior Black Mafia. He also asserted that no juror had made any comment about Youngblood's prior criminal record and that he had not mentioned anything about the defendant's involvement with drugs. He explained that his post-verdict remarks to defense counsel were prompted by an incident that occurred at the end of the first day of deliberations. At that time, another juror asked him if he wanted to serve on the jury. He answered that initially he did not desire to do so because he "knew already about the case," but that he had been called to sidebar and asked what he knew, and then he was not dismissed. Thereafter, a juror asked him if, being from the city, he felt threatened because of the defendant's "background." Juror No. 2 responded that the other juror did not specify what was meant by the term "background." When the court asked what Juror No. 2 had disclosed to the other jurors concerning his prior knowledge of the case, he said he told them that he was in City Hall the day the defendant was indicted and "all the cameras" were there, and told them he knew that the trial was ready to begin. Juror No. 2's explanation was inconsistent with what was recorded in the defendant's motion, which had precipitated the hearing.

Juror No. 1, the foreperson, recalled that at the end of the first day of deliberations, after the jurors had voted on all of the fraud and extortion charges and had moved on to the tax charges, one of the jurors wondered out loud what the defendant had done to be fired from the official City payroll in 1993. At that point, according to Juror No. 1, Juror No. 2 "briefly mentioned" to the rest of the jurors that the defendant had "a criminal past" involving drugs. The foreperson further related to the court that the jury "decided that that was irrelevant anyway, it made no difference, so we just moved on." Juror No. 1 did not recall any mention of the

defendant's connection to the Junior Black Mafia.

Juror No. 7 was the next to testify. She recounted that at the end of the first day of deliberations, Juror No. 2 had told the rest of the jury that the defendant "was associated with the Junior Black Mafia." Upon hearing the information, she recalled, "[W]e said that has nothing to do with this trial and we're not going to discuss it." According to her, the conversation on the subject then ceased. While she did not remember any mention of the defendant's prior drug conviction or any further discussions about the Junior Black Mafia, she volunteered to the court at the hearing (but not to the jurors during deliberations), "[I]f you grew up in this area you'd know that ... [the Junior Black Mafia] was associated with drugs ..."

Juror No. 4 recalled that "late in deliberations," another juror informed the rest that the defendant "was ... part of the Black Mafia" and that he had been "found guilty on drug charges." Juror No. 4 did not remember who made the remarks but said they were made in the same "conversation." Neither Juror No. 4 nor Juror No. 7 recalled any juror saying that he or she knew more about the case than what was disclosed to the court.

## I.

■ Dating back at least one hundred years, it has been the settled general rule in this country that jurors' testimony is not admissible to impeach a jury verdict. *See Tanner v. United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). However, there is an exception to this rule in situations where the jury has been exposed to an "extraneous influence." *Id.* (internal quotations and citation omitted). Rule 606(b) of the Federal Rules of Evidence is grounded in these common law principles. *See id.* at 121, 107 S.Ct. 2739. The Rule provides, in relevant part:

Upon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement occurring dur-

ing the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror....

Fed.R.Evid. 606(b). When there is a showing that "extrinsic influence or relationships have tainted the deliberations," an evidentiary hearing is proper. *Tanner*, 483 U.S. at 120, 107 S.Ct. 2739. In accordance with Rule 606(b), the court may inquire about the existence of an exposure to extra-record information, but it may not inquire about the subjective effect of any such information on the jurors. *See Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 394 (3d Cir.1999).

■ A defendant in a criminal case is entitled to a trial by an impartial jury and a determination of his guilt or innocence based solely upon evidence admitted at trial. *See Government of Virgin Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987). Jury exposure to facts outside of the trial record, called "jury misconduct" in the case law, may inject bias into deliberations and subvert the fact-finding process, *see Waldorf v. Shuta*, 3 F.3d 705, 709 (3d Cir.1993), thereby denying the defendant his Sixth Amendment right to a fair trial.

■ Not every instance of jury misconduct, however, requires a new trial. *See United States v. DiSalvo*, 34 F.3d 1204, 1223 (3d Cir.1994). The defendant must show that he was prejudiced. *See id.* Certain types of jury misconduct raise a presumption of prejudice, and the government then has the burden of proving that the remarks were not prejudicial. *See Remmer v. United States*, 347 U.S. 227,

229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Console*, 13 F.3d 641, 666 (3d Cir.1993); *Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 154 (3d Cir.1975). The determination of whether the defendant was prejudiced is case-specific. "[E]ach case must turn on its special facts." *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

■■■ Our duty is to make "an objective assessment of the effect of the extraneous information on the hypothetical average juror." *Wilson*, 170 F.3d at 395; *see also Waldorf*, 3 F.3d at 710. Relevant considerations include the following:

(a) the nature of the information and the manner in which it was conveyed, *see Dowling*, 814 F.2d at 138;

(b) if the information had to do with a prior crime, whether that prior crime is substantially similar to the ones for which the defendant was tried in the case at bar, *see id.* at 140;

(c) the instructions given to the jury that have bearing upon the specific jury misconduct alleged, *see DiSalvo*, 34 F.3d at 1226; *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir.1993);

(d) the extent to which the jury discussed the information, *see United States v. Keating*, 147 F.3d 895, 902 (9th Cir.1998);

(e) the timing of the comments, or the point at which the information was introduced during deliberations, *see id.*;

(f) whether the jury found the defendant not guilty on any counts, *see DiSalvo*, 34 F.3d at 1226; and

(g) the strength of the evidence of guilt, *see Thornton*, 1 F.3d at 156; *Keating*, 147 F.3d at 903.

None of these factors is dispositive. Our determination of whether the defendant was prejudiced "turns on all of the surrounding circumstances." *Dowling*, 814 F.2d at 138.

## II.

Defendant's motion disclosed possible jury exposure to potentially prejudicial extra-record information. Because of the limitations imposed by Rule 606(b) of the Federal Rules of Evidence, we restricted our April 15 inquiry to "extraneous ... information" and "any outside influence[s]."[1] Although he did not concede it, we find that Juror No. 2 told the other jurors, at the end of the first day of deliberations, that the defendant was part of or had a connection with the Junior Black Mafia and that he had a prior criminal conviction for a drug offense when fired from the City in February, 1993. We do not know where or when Juror No. 2 heard this information, but it was not part of the evidence presented at trial. The defendant argues for a new trial based on the jury's exposure to this information.

■■■ Because it is clear the jury was exposed to extra-record information about the defendant, we turn to the issue of prejudice. The government concedes that, due to the nature of the extra-record information to which this jury was exposed, it has the burden of rebutting the presumption that the defendant was prejudiced. The Supreme Court has stated that, in such circumstances, "the burden rests heavily upon the Government to establish ... [that the jury misconduct] was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In determining whether a new trial is necessary when there has been an improper admission at trial of evidence regarding a defendant's prior crime, the Court of Appeals for the Third Circuit requires us to ask whether it is "highly probable that the error did not contribute to the judgment." *Government of the Virgin Islands v. Toto*, 529 F.2d 278,

---

**1.** For this reason, we did not specifically inquire into the remarks "that the other jurors had their decision made prior to deliberation," or whether jurors did in fact base their verdict on the defendant's "character."

284 (3d Cir.1976). "The high probability standard is met when the court possesses a 'sure conviction' that the error did not prejudice a defendant." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999), (citation omitted). We apply the high probability standard in assessing whether the government has rebutted the presumption of prejudice in this case. We make our assessment by determining how the extraneous information would have affected "the hypothetical average juror." *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 395 (3d Cir.1999).

The jury was exposed to information that Youngblood was somehow associated with the Junior Black Mafia. It appears that the jury was told the defendant "was" affiliated with the group, but we do not know the period to which Juror No. 2 was referring. One juror believed that "if you grew up in this area you'd know that . . . [the Junior Black Mafia] was associated with drugs." However, neither Juror No. 2 nor any other juror elaborated on what the Junior Black Mafia was or in what kinds of activities it engaged. This aspect of our case is similar to *United States v. DiSalvo*, 34 F.3d 1204 (3d Cir.1994). There, defendant Simone was convicted of a number of extortion offenses and violations of the Racketeer Influenced and Corrupt Organization Act. *See id.* at 1207. He challenged his conviction on the ground that publicity during the trial had denied him his Sixth Amendment right to a fair trial. In support of his argument, he pointed to newspaper articles which characterized him as a "mob lawyer." *Id.* at 1222. The Court of Appeals for the Third Circuit concluded, "[W]hile the 'mob lawyer' characterization was not necessarily

flattering to Simone, use of this term is not sufficiently prejudicial to constitute a violation of Simone's Sixth Amendment rights." *Id.*

Juror No. 2 also told the other jurors that the defendant had a drug conviction which was related to the loss of his job with the City in February, 1993. "Information about prior criminal convictions or activities is the kind of information that carries great potential for prejudicing the jury." *Government of Virgin Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir.1987). It is important to note here, though, that the conviction, mentioned by only one juror, was not recent. It was at least six years old, going back to the time the defendant was fired by the City. Juror No. 2 did not indicate the source of his information. He did not tell them that he learned it from a newspaper article or any other source that jurors might have considered authoritative. Furthermore, an old drug offense without more is not the sort of highly inflammatory crime that is "revolting and abhorrent to the conscience of our society." *United States v. Gray*, 468 F.2d 257, 259 (3d Cir.1972).[2]

Additionally, the information about the defendant's conviction and mafia affiliation was completely unrelated to the present case. The crimes for which Youngblood was tried in this court, including extortion, bank fraud, and tax crimes, have no similarity to a drug offense. Indeed, there was absolutely no evidence about drugs. Furthermore, there was nothing in the record that Youngblood was acting in concert with any other person when he committed the crimes at issue in this case. There was no indication whatso-

---

**2.** In *Gray*, the defendant was convicted by a jury of bank robbery. Previously, he had been convicted of the voluntary manslaughter of his wife. In the bank robbery trial, he testified in his own defense. On cross-examination, the prosecutor asked him, "You say your wife was killed. You killed her, didn't you?" *Gray*, 468 F.2d at 259. Although it may have been proper to impeach the defendant with his voluntary manslaughter convic-

tion, the Court of Appeals for the Third Circuit concluded that a new trial was necessary because of the prosecutor's "grievous plain error" in asking a question that implied the defendant had committed the "atrocious crime" of killing his spouse. *Id.* The prosecutor's cross-examination had "undisputably transgressed the permissible limits of questioning as to prior convictions." *Id.* at 262.

ever that he may have been acting as part of any group such as the Junior Black Mafia.

It must also be emphasized that the court instructed the jury several times, including in the final charge, that it was to base its decision solely on the evidence admitted at trial. Jurors, who take a solemn oath, are presumed to have followed the trial court's instructions. *See Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *DiSalvo,* 34 F.3d at 1223. Here, jurors immediately cut off the discussion of the extra-record information. They understood it was not relevant.

According to the foreperson, the jury had already voted on all of the extortion and bank fraud charges by the time Juror No. 2 made his comments. It is true, as the defendant contends, that the jury may always revisit an earlier vote until the verdict is announced. However, we find it significant that the jury acquitted the defendant on Count Thirty–One. The vote on Count Thirty–One occurred *after* the jury heard about the extra-record information. "[W]hen the jury is instructed to base its verdict solely on the evidence and it acquits the defendant of certain counts, such factors indicate that the jury was not biased." *DiSalvo,* 34 F.3d at 1226. The timing of the one finding of not guilty in this case is another strong indication that the defendant was not prejudiced by any jury misconduct.

Finally, it is compelling that the government produced overwhelming and virtually uncontradicted evidence of the defendant's guilt. The government's evidence included the testimony of a number of contractors who were extorted. A bank employee identified the defendant's handwriting on checks and observed that he had endorsed checks made out to other persons and deposited the monies into bank accounts over which he had control. There was also uncontradicted testimony that Youngblood had received payment for his work at the Deliverance Center of Hope—II and that Councilwoman Blackwell had paid him a salary as her aide out of her own paychecks from 1993 to present—none of which was disclosed by Youngblood to the government. The testimony was strongly corroborated by bank records, checks, and invoices. The defense called no witnesses.

Although the determination of whether a defendant was prejudiced is made on a case-by-case basis, we think it is instructive to compare this case to others in which the jury was exposed to extra-record information about the defendant's prior criminal acts. In *Marshall,* the Supreme Court, in an exercise of its supervisory powers, ordered a new trial for a man convicted of unlawfully dispensing drugs without a prescription. *See Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). At trial, Marshall had presented an entrapment defense. The government sought to admit evidence that the defendant previously had practiced medicine without a license in order to refute the defense. The judge excluded it. However, during trial, seven jurors read newspaper reports containing the excluded information. In *Marshall,* the crime for which the defendant was tried and the ones the jury learned he committed in the past were of a similar kind. Both involved the practice of medicine. In addition, any extra-record information suggesting that the defendant may have had a predisposition for crime was even more harmful to him because he had presented an entrapment defense.

In *United States v. Keating,* 147 F.3d 895 (9th Cir.1998), Charles H. Keating, Jr. was convicted of "myriad violations of federal law" arising out of a scheme to steal money from a federally insured thrift, a savings and loan association, and others. *Id.* at 897. Ten months before the federal trial, he had been convicted of aiding and abetting a fraudulent sale of bonds in a California state court. The earlier charges arose out of the same facts at issue in the federal trial. The federal judge excluded

evidence of the state conviction because the prejudice was " 'overwhelmingly great.' " *Id.* at 898. After the verdict, the trial court discovered that some of the jurors had learned during the trial about Keating's state court conviction and also knew that the conviction was based on essentially the same facts as the federal case. The Court of Appeals for the Ninth Circuit affirmed the district court's order mandating a new trial. The court emphasized that the state and federal crimes charged were identical and were based on the same set of facts, and at the federal trial the evidence of the defendant's guilt was "not overwhelming." *Id.* at 903.

Under all of the circumstances, we find the government has met its heavy burden of showing that it is highly probable that the extraneous information did not affect the verdict. *See Remmer,* 347 U.S. at 229, 74 S.Ct. 450; *Toto,* 529 F.2d at 284. We possess a "sure conviction" that the hypothetical average juror's verdict would not have been affected by the extra-record information and that the jury misconduct did not prejudice the defendant. *Mastrangelo,* 172 F.3d 288, 297. If we were to require a new trial under the circumstances in this case, it would be tantamount to creating a per se rule that whenever the jury is exposed to any extra-record information regarding a defendant's prior criminal acts, a new trial is mandated. Absolute rules, however, have no place here in a determination of whether a defendant was prejudiced. The Supreme Court recognized as much when it stated, "each case must turn on its special facts." *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

To summarize the specific circumstances in this case, the prior drug conviction, at least six years old, was not inflammatory in nature and was entirely different that the offenses charged here. It did not arise out of the same events as in this case. No evidence at all was presented at this trial relating to drugs. Moreover, there was no evidence of any kind of mob activity.

Youngblood was acting alone. We had instructed the jury repeatedly to make its decision solely based on the evidence presented at trial. The extra-record comments in issue were made only briefly during deliberations by one juror and were dismissed as irrelevant. Indeed, the jury acquitted on one count after the remarks were made. Finally, and perhaps most importantly, the evidence of the defendant's guilt on thirty-four of the counts was overwhelming. For these reasons, we will deny the defendant's motion for a new trial.

### ORDER

AND NOW, this 10th day of May, 1999, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of the defendant for a new trial based on juror misconduct is DENIED.