**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2790
_____

UNITED STATES OF AMERICA

v.

GLORIOUS SHAVERS,
a/k/a G,
a/k/a G-Bucks,
a/k/a Julious Colzie,
a/k/a Glorious Grand

Glorious Shavers,

Appellant
_____

No. 10-2931
_____

UNITED STATES OF AMERICA

v.

JERMEL LEWIS,

a/k/a STAR,
a/k/a PR-STAR,
a/k/a P

Jermel Lewis,

Appellant

_____

No. 10-2971

_____

UNITED STATES OF AMERICA

v.

ANDREW WHITE,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. Nos. 08-01616-001, 08-0161-002, 08-0161-003)
District Judge:  Honorable J. Curtis Joyner

Argued March 19, 2012

_____

Before: RENDELL, FISHER, and CHAGARES, Circuit
Judges.

(Filed:  August 27, 2012)

2

Keith M. Donoghue, Esq. (Argued)
Robert Epstein, Esq.
Kai N. Scott, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        Attorneys for Appellant Glorious Shavers

Paul J. Hetznecker, Esq. (Argued)
Suite 911
1420 Walnut Street
Philadelphia, PA 19102
        Attorney for Appellant Jermel Lewis

Carina Laguzzi, Esq.
Laguzzi & Associates
1500 John F. Kennedy Boulevard
Suite 200
Philadelphia, PA 19102
        Attorney for Appellant Andrew White

Robert A. Zauzmer, Esq. (Argued)
Arlene D. Fisk, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        Attorneys for Appellee

―――――――――――――

OPINION

―――――――――――――

CHAGARES, <u>Circuit Judge</u>.

This is a consolidated appeal by three codefendants, Glorious Shavers, Andrew White, and Jermel Lewis (collectively referred to as the "appellants"), who were convicted of robbery affecting interstate commerce, conspiracy to commit robbery affecting interstate commerce, witness tampering, and using and carrying firearms during and in relation to a crime of violence. We will vacate Shavers's and White's witness tampering convictions and Shavers's eight-year term of supervised release. We will uphold the three appellants' convictions on all other counts and will affirm Lewis's sentence. Finally, we will remand for the District Court to resentence Shavers and White in accordance with this opinion.

I.

This case arose out of a robbery on November 8, 2005 at a single-family house in North Philadelphia. The house owner, Jeanette Ketchmore ("Jeanette"), had for several years run an unlicensed bar, or "speakeasy," out of her basement. At trial, she described her activity as a party at which family, friends, and acquaintances would socialize and occasionally play cards. The speakeasy was not open to the general public. Jeanette purchased alcohol at a retail store in Philadelphia and sold it without a license to her guests for $3-$4 per drink. The brands of alcohol sold included some that are

4

manufactured outside of Pennsylvania such as Hennessy cognac, Gordon's gin, Seagram's gin, and Taylor's port wine.

When the appellants entered Jeanette's house on November 8, 2005 at 5:30 a.m., six to seven people were in the first floor dining room playing cards. The parties dispute whether alcohol sales had ceased for the night. The three appellants entered the residence displaying firearms and wearing dark-colored hooded sweatshirts with the hoods drawn tightly around their faces. The appellants forced the patrons into the basement and ordered them to lie down on the floor. One of the appellants went to the second floor and forced Jeanette's son, Rickey Ketchmore ("Rickey"), to come downstairs to join the patrons. The appellants then went through everyone's pockets and stole two cell phones, a wallet, and approximately $121 in cash. No money was stolen directly from Jeanette, however. The appellants also rummaged through the basement and first floor of the house. Jeanette testified that the appellants went through her refrigerator and kept asking where the "weed" (marijuana), "wet" (PCP), and "oil" (heroin or PCP) was.[1] Joint Appendix ("JA") 1168–69, 1217. They also asked Jeanette where "the money" was. Id. at 1167.

When the police arrived, the three appellants ran out of the house and down the street. White was seen tossing a silver gun as he ran. White and Shavers were arrested in the

---

[1] Before trial, the Government moved for leave to file a superseding indictment adding an allegation that the appellants attempted to steal drugs from Jeanette. The District Court denied that request due to discovery violations and did not permit the admission of evidence supporting that theory.

area soon thereafter. White had two cell phones that were stolen from the speakeasy patrons and $49 in cash, including twenty-nine one-dollar bills. Shavers had three live shotgun shells in his pocket and $87 in cash, including sixty-two one-dollar bills. After the police apprehended Shavers and White, they returned to Jeanette's house and asked eyewitnesses Alberto Vasquez and Brian Anderson whether they recognized the two men sitting in the police vehicles. Vasquez and Anderson identified Shavers and White as two of the three assailants. Lewis was apprehended years later after an investigation.

Shavers and White were originally charged with Pennsylvania offenses and kept in state custody. On March 20, 2008, however, the United States Attorney charged them with robbery affecting interstate commerce, in violation of the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2, and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2.[2] On July 10, 2008, a superseding indictment added Lewis to the first two counts, and also added charges against all three appellants of attempts to intimidate, threaten, and/or corruptly persuade a witness in an official proceeding, in violation of the Victim and Witness Protection Act of 1982, 18 U.S.C. § 1512(b)(1). The witness intimidation charges were largely based on telephone calls that the appellants conducted on state prison telephones in which they made incriminating comments. On August 20, 2009, the Government filed a second superseding indictment adding additional witness tampering counts and a count of conspiracy to commit

---

[2] The state charges were nolle prossed after commencement of the federal prosecution.

robbery in violation of the Hobbs Act against all three appellants.

A joint trial of the three appellants commenced on September 9, 2009 in the United States District Court for the Eastern District of Pennsylvania. After six days of testimony, the jury found all three appellants guilty of the Hobbs Act and § 924(c) violations, and found Shavers and White guilty of three counts of witness tampering each. Lewis was acquitted of all witness tampering charges. After denying the appellants' motions for judgments of acquittal, the District Court sentenced Shavers to 144 months of incarceration with an eight-year term of supervised release, Lewis to 141 months of incarceration with five years of supervised release, and White to 196 months of incarceration with five years of supervised release. All three sentences included a mandatory minimum consecutive term of eighty-four months on the § 924(c) count. The appellants filed a timely appeal raising ten arguments that we will address in turn.[3]

## II. The Hobbs Act Convictions

### A.

Shavers and White first contend that the District Court erroneously instructed the jury that a robbery need only have a de minimis or potential effect on interstate commerce in order to violate the Hobbs Act. While the appellants

---

[3] The District Court had jurisdiction over the prosecution of this criminal action pursuant to 18 U.S.C. § 3231 and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

acknowledge that our controlling precedent forecloses relief on this claim, they seek to preserve it for future review.

We exercise plenary review over a challenge to the legal accuracy of jury instructions. Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 245 (3d Cir. 2006). The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). "Commerce" is defined as

> commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

Id. § 1951(b)(3).

Due to the requirement that a Hobbs Act offense "obstructs, delays, or affects" interstate commerce, "the reach

8

of the Hobbs Act is coextensive with that of the Commerce Clause of the United States Constitution." United States v. Walker, 657 F.3d 160, 179 (3d Cir. 2011) (quotation marks omitted). The Commerce Clause delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. In United States v. Lopez, which involved a challenge to the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(g)(1)(A), the United States Supreme Court held that there are "three broad categories of activity" that Congress may regulate under the Commerce Clause: (1) "the use of the channels of interstate commerce[;]" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities[;]" and (3) "those activities having a substantial relation to interstate commerce." 514 U.S. 549, 558–59 (1995). The Lopez Court concluded that the possession of a gun in a local school zone did not fall into any of those categories. In particular, the regulated activity did not have a substantial relation to interstate commerce because "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.

The District Court in this case instructed the jury on the interstate commerce element as follows:

> The third element that the Government must prove beyond a reasonable doubt is that the Defendant's conduct affected or could have affected interstate commerce. Conduct affects interstate commerce if it in any way interferes

with[,] changes, alters the movement or transportation or flow of goods, merchandise, money or other property in commerce between or among the states. The effect can be minimal.

It is not necessary to prove that the Defendant intended to obstruct . . . delay or interfere [with] interstate commerce or that the purpose of the alleged crime was to affect interstate commerce. Further, you do not have to decide whether the affect on interstate commerce was to be harmful or beneficial to a particular business or to commerce in general. You do not even have to find that there was an actual effect on commerce. All that is necessary to prove this element is that the natural consequences of the offense potentially caused an effect on interstate commerce to any degree, however minimal or slight.

JA 2016 (emphasis added). Shavers and White argue that the District Court's instruction was incorrect. They interpret Lopez as holding that Congress may regulate only conduct that substantially affects interstate commerce, and may not regulate conduct that has a mere minimal or potential effect on interstate commerce.

Our decisions have consistently and firmly rejected that argument. See, e.g., United States v. Urban, 404 F.3d 754, 766 (3d Cir. 2005) ("[W]e have already rejected the argument that Lopez and its progeny require proof of a 'substantial effect' on commerce in an individual case in order to show a Hobbs Act violation."). We have held instead

10

that "[i]f the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under [the Hobbs Act]." United States v. Haywood, 363 F.3d 200, 209–10 (3d Cir. 2004) (quotation marks omitted). A "reasonably probable effect on commerce, however minimal," is sufficient to meet the interstate commerce jurisdictional prerequisite under the Hobbs Act. Urban, 404 F.3d at 763–64; see also United States v. Clausen, 328 F.3d 708, 711 (3d Cir. 2003) ("[T]he District Court did not err when it instructed the jury that it need only find that each robbery had a minimal effect on interstate commerce.").

While we acknowledge that our long-standing precedent sets a rather low hurdle for the Government in Hobbs Act cases, we conclude that our interpretation of the interstate commerce jurisdictional requirement is supported by Supreme Court precedent. In Gonzales v. Raich, the Supreme Court upheld the application of provisions of the Controlled Substances Act, 21 U.S.C. § 801 et seq., that criminalize the manufacture, distribution, and possession of marijuana to intrastate growers and users of marijuana, holding that Congress possesses the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." 545 U.S. 1, 17 (2005) (citing Wickard v. Filburn, 317 U.S. 111, 128–29 (1942)). Under the aggregation theory relied upon in Raich, the Commerce Clause supports federal regulation of an economic class of activity that, in the aggregate, substantially affects interstate commerce. Id. at 17–19. That is the case even where an individual crime on its own has only a minimal effect on interstate commerce. Id. at 17 ("[W]hen a general regulatory

11

statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." (quotation marks omitted)). Even a potential effect may suffice. Id. at 35 (Scalia, J., concurring) ("Most directly, the commerce power permits Congress not only to devise rules for the governance of commerce between States but also to facilitate interstate commerce by eliminating potential obstructions, and to restrict it by eliminating potential stimulants."). We have opined that "the Hobbs Act regulates quintessentially 'economic' activities" because "property crimes like robbery and extortion are — unlike the possession of a gun in a school zone or gender-motivated violence — indisputably 'economic' under our post-Lopez precedents." Walker, 657 F.3d at 179. Like the statute in Raich, the Hobbs Act regulates an economic "class of activities" that, in the aggregate, has a substantial effect on interstate commerce. 545 U.S. at 17. The proper standard for such activity, therefore, is exactly as the District Court articulated it to the jury.

B.

The three appellants further assert that, even under the standard as the District Court expressed it, the Government failed to present sufficient evidence that their crimes had an adequate effect on interstate commerce to meet the jurisdictional requirement in the Hobbs Act. On challenges to the sufficiency of the evidence, we apply "a particularly deferential standard of review." United States v. McGuire, 178 F.3d 203, 206 n.2 (3d Cir. 1999). We do not weigh the evidence or assess the credibility of the witnesses. Id. "[W]e must view the evidence in the light most favorable to the

government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quotation marks omitted). We "afford deference to a jury's findings, and draw all reasonable inferences in favor of the jury verdict." United States v. Moyer, 674 F.3d 192, 206 (3d Cir. 2012) (quotation marks omitted). We will overturn the verdict "only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." Id.

As we have just discussed, the effect on commerce of a Hobbs Act robbery may be shown by a "reasonably probable effect on commerce, however minimal." Urban, 404 F.3d at 763–64. Where the robbery "produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under [the Hobbs Act]." Haywood, 363 F.3d at 210 (quotation marks omitted). In United States v. Walker, for example, we held that the robbery of a drug dealer whose drugs originated in another state had a "direct nexus" to interstate commerce within the meaning of the Hobbs Act. 657 F.3d at 182. By robbing a drug dealer, the defendants "directly [sought] to obstruct the movement of a commodity in commerce." Id. at 181 (quotation marks and alterations omitted).

In United States v. Haywood, whose facts are analogous to the facts in this case, the defendant was convicted under the Hobbs Act of robbing a Virgin Islands tavern of approximately $50–$70. 363 F.3d at 202. We held that the interstate commerce nexus was satisfied because the tavern sold beer that was manufactured outside of the Virgin Islands. Id. at 211. Likewise, in United States v. Clausen, we

13

held that there was a sufficient nexus to interstate commerce where the defendants had robbed six businesses that purchased supplies from other states, and/or had employees or customers from other states. 328 F.3d at 711–12. We underscored that "'the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce,' and that substantial effect empowers Congress to regulate pursuant to the Commerce Clause." Id. at 711 (quoting United States v. Robinson, 119 F.3d 1205, 1215 (5th Cir. 1997)).[4]

---

[4] In some cases, we have also turned to the "depletion of assets" theory to explain the nexus between the offense charged and interstate commerce. In United States v. Urban, for instance, we reviewed the convictions of several city plumbing inspectors who had committed extortion, allegedly in violation of the Hobbs Act, by accepting payments from the plumbers whose work they inspected. 404 F.3d at 759. We held that the Hobbs Act jurisdictional element was satisfied because the extortion depleted the assets that the plumbers had available to purchase supplies made out-of-state. Id. at 761, 767. We explained that "the depletion of assets of a person engaged in interstate commerce has at least a 'potential' effect on that person's engagement in interstate commerce." Id. at 767.

That theory is not helpful here. While Rickey testified that he saw one of the perpetrators holding two bottles of liquor during the robbery, the Government told the jury in its closing argument that those bottles did not leave the house. Thus, we do not rely on that testimony as evidence that proceeds of the business were stolen.

14

On this record, there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that Jeanette was running a business that had the requisite nexus to interstate commerce. Although the speakeasy was not a licensed bar, it was selling alcohol and the people playing cards at the time of the robbery were its customers. Jeanette had been operating the speakeasy for "years" at the time of the robbery. JA 1157. In her testimony, Jeanette agreed that the speakeasy was a business and indicated that she was making a profit. Id. at 1156, 1163 ("[W]e would purchase more beer, alcohol, and sometimes I might have enough to pay a bill to help me with my — send my child to school."). Like in Haywood, Jeanette sold alcohol that was imported from out of state. Although that connection to interstate commerce is admittedly indirect, it is no more so than in the cases discussed above and it is a sufficient nexus to interstate commerce under our jurisprudence. See Urban, 404 F.3d at 761, 767; Haywood, 363 F.3d at 211; Clausen, 328 F.3d at 711–12; see also United States v. Elias, 285 F.3d 183, 189 (2d Cir. 2002) (holding that the interstate commerce

---

The Government also avers that White's and Shavers's possession of large numbers of one-dollar bills was consistent with the speakeasy prices of $3-$4 per drink and demonstrates that they absconded with business assets. The appellants respond that the possession of many one-dollar bills is more consistent with the victims' card playing. Either way, it was for the jury to decide, based on the other evidence, which inference to draw from the denominations. Our role is not to weigh the evidence with respect to such factual questions so long as there was some evidence presented from which a reasonable jury could have found the essential elements of the crime.

15

requirement for a Hobbs Act violation was met where the defendant robbed a New York grocery store that sold goods purchased in New York but produced outside of New York because the robbery "depleted assets that might have been utilized to purchase out-of-state goods"); United States v. Mapp, 170 F.3d 328, 336 n.13 (2d Cir. 1999) (holding that the Hobbs Act jurisdictional nexus was met by the robbery of a delicatessen that sold goods produced out of state, without mentioning whether the goods were purchased from out-of-state or in-state suppliers).

There was also evidence here from which a rational jury could find beyond a reasonable doubt that the robbery had an effect, albeit slight or potential, on interstate commerce. For instance, Jeanette testified that, after the robbery, she limited her guests to friends and family and then shut down the operation completely a few months later. At least one speakeasy customer, Alberto Vasquez, chose not to return and spend his money at the speakeasy after the robbery. From that evidence, a jury could reasonably infer that the robbery caused the business to close. Causing a business engaged in interstate commerce to close has, or at least potentially has, an effect on interstate commerce. See United States v. Jimenez-Torres, 435 F.3d 3, 8 (1st Cir. 2006) (holding that the Government can satisfy the Hobbs Act interstate commerce requirement by showing that the robbery resulted in the closure of a business engaged in interstate commerce). Moreover, such conduct, in the aggregate, would have a substantial effect on interstate commerce. See Raich, 545 U.S. at 17–19. Although this robbery was of a small business that purchased alcohol sold in interstate commerce, if robberies occurred at and led to the closure of such establishments on a large scale, the effect on interstate

16

commerce would be substantial. For that reason, the size of Jeanette's business and the fact that the appellants stole only $121 dollars, a wallet, and two cell phones did not make this crime too small to satisfy the de minimis standard. See Walker, 657 F.3d at 180 (holding that a robbery of $40 to $50 satisfied the de minimis standard); Haywood, 363 F.3d at 202, 211 n.7 (holding that the de minimis threshold was met by the robbery of $50 to $70).

The appellants maintain that the facts here are analogous to those in United States v. McGuire, in which the defendant was charged with a violation of the federal explosives statute, 18 U.S.C. § 844(i), for the destruction of a personal car that was used periodically by a small intrastate catering business. 178 F.3d at 211. We held that the Government failed to establish the requisite nexus to interstate commerce because there was no evidence as to how often the car was used for the business or that a container of orange juice from another state that was found in the car was related to the catering business. Id. at 211–12. Thus, "the jury was required to guess at" the connection between the car and the catering business. Id. at 211. McGuire is easily distinguishable from this case, where the jury was not left to guess at the connections between the victims of the robbery and the business, and between the business and interstate commerce. Additionally, it was undisputed in McGuire that the catering business did not lose money or customers due to the defendant's conduct. Id. at 211. Here, to the contrary, there was certainly adequate evidence from which a jury could infer that the robbery was an attempt to — and did in fact — affect a business operating in interstate commerce.

17

The appellants invite us to follow the Court of Appeals for the Sixth Circuit and impose a heightened interstate commerce requirement when the victim of the alleged crime is an individual rather than a business. In United States v. Wang, the Court of Appeals for the Sixth Circuit held that the Hobbs Act interstate commerce nexus was too attenuated where the defendant robbed the owners of a business in their home. 222 F.3d 234, 240 (6th Cir. 2000). The Court concluded that, when the Government seeks to establish a nexus between an individual victim and a business engaged in interstate commerce, "that connection must be a substantial one — not one that is fortuitous or speculative." Id. at 239–40. In Wang, some of the stolen money belonged to the victims' restaurant that operated in interstate commerce but, because the robbery was of a home, the Government needed to do more than show that the victims owned a business. Id. at 240.

The appellants also note cases in which the interstate commerce nexus was held to be too tenuous because the robbery was directed at an individual in his or her personal capacity rather than at a business. See United States v. Perrotta, 313 F.3d 33, 38–40 (2d Cir. 2002) (holding that the interstate commerce nexus was too attenuated where extortion was directed at a victim who worked for an entity engaged in interstate commerce, but was aimed at him in his personal capacity, not in his official capacity); United States v. Quigley, 53 F.3d 909, 910–11 (8th Cir. 1995) (holding that the robbery of two individuals en route to a liquor store did not have a potential effect on interstate commerce); United States v. Collins, 40 F.3d 95, 99–100 (5th Cir. 1994) (holding that the Hobbs Act did not apply to the robbery of a computer company executive in his home, even though the crime may

have prevented him from getting to work or making business calls because his "only connection with interstate commerce was his employment by a business engaged in interstate commerce"). The appellants further argue that the connection must be even stronger when a home is robbed. Indeed, we have exercised caution when assessing a Hobbs Act prosecution for the robbery of a home. Jimenez-Torres, 435 F.3d at 7–8 ("Where . . . the crime concerns the robbery of a home rather than of a business, we approach the task of applying the de minimus standard with some caution, lest every robbery (which by definition has some economic component) become a federal crime.").

We decline to adopt the heightened standard set forth in Wang. In this circuit, a robbery under the Hobbs Act need only have a "reasonably probable effect on commerce, however minimal." Urban, 404 F.3d at 763–64. The "substantial" connection required in Wang has no basis in our case law and adopting it would contradict our adherence to the requirement that a robbery need only "produce[] any interference with or effect upon interstate commerce, whether slight, subtle or even potential," in order to support prosecution under the Hobbs Act. Haywood, 363 F.3d at 210 (quotation marks omitted).

Moreover, Wang and the other cases in which the robberies were directed at individuals in their personal capacity rather than at businesses are inapposite. The appellants here did not rob individuals in their personal capacity or in their homes. To the contrary, the robbery occurred in Jeanette's place of business, her customers were victimized and robbed, and there was evidence that the robbery targeted business assets. Testimony from customers

19

of the speakeasy indicated that the gatherings at Jeanette's were not merely social events with friends. For instance, Vasquez testified that Jeanette's house was "a place where people would go after time inside the bars that they closed up at 2:00. You stop in for a couple drinks. It's known on the streets as a speakeasy." JA 962–63. Likewise, Anderson testified that the basement was "set up like a bar" and that "it was a speakeasy." Id. at 871, 899. Even if we assume that alcohol was no longer being sold at the time of the robbery, that disputed fact does not alter our conclusion, as the reason the victims were in Jeanette's house was due to her business selling alcohol and they were still playing cards in the dining room when the robbery occurred. Thus, there was sufficient evidence that appellants robbed individuals, but in their capacity as customers of a business.

There was also evidence in the record from which a rational jury could conclude that the appellants targeted the assets of Jeanette's business, not solely the customers. The appellants had a meeting the night before the robbery in which they learned about a house with "a lot of money in it." JA 1430. During the robbery, they asked Jeanette where "the money" was and rummaged through her refrigerator. App. 1167–69. The nexus to interstate commerce in this case was, therefore, more direct than in Wang and the other cases cited by the appellants. See Walker, 657 F.3d at 181 (holding that the connection between the robbery and interstate commerce was "much more direct" than in Wang because, at the time of the robbery, the victim in Walker was selling illegal drugs that had traveled through interstate commerce).

We recognize that this case stands at the outer limit of Hobbs Act jurisdiction and it is far from obvious which cases

20

are purely matters for state prosecution. The Hobbs Act interstate commerce question must be resolved on a case-by-case basis. See Lopez, 514 U.S. at 561 (noting that a "case-by-case inquiry" is undertaken for statutes containing a jurisdictional element). When we view the evidence in this case in the light most favorable to the Government, we conclude that there was a sufficient nexus to interstate commerce to support the appellants' convictions under the Hobbs Act.

III.    The Witness Tampering Convictions

Shavers and White next contend that the evidence presented at trial was insufficient to support their convictions for witness tampering. Despite the considerable deference that we afford to a jury's findings in reviewing a conviction for sufficiency of the evidence, we agree and conclude that the evidence in this case does not support the witness tampering convictions.

A.

In relevant part, the Victim and Witness Protection Act of 1982 ("VWPA") provides:

> **(b)** Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to–
>
> **(1)** influence, delay, or prevent the testimony of any person in an official proceeding;

21

**(2)** cause or induce any person to--

> **(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

> **(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

> **(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

> **(D)** be absent from an official proceeding to which such person has been summoned by legal process; or

**(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(b).

22

Shavers and White were convicted of violating §
1512(b)(1), which seeks to safeguard anticipated testimony in
an "official proceeding." An "official proceeding" for the
purposes of the VWPA is defined as

> a proceeding before a judge or court of the
> United States, a United States magistrate judge,
> a bankruptcy judge, a judge of the United States
> Tax Court, a special trial judge of the Tax
> Court, a judge of the United States Court of
> Federal Claims, or a Federal grand jury.

Id. § 1515(a)(1)(A). The VWPA explicitly provides that "an
official proceeding need not be pending or about to be
instituted at the time of the offense." Id. § 1512(f)(1). There
does, however, need to be a connection between the
defendant's conduct and the official proceeding. In Arthur
Anderson LLP v. United States, the United States Supreme
Court reviewed convictions under § 1512(b)(2)(A) and (B).
544 U.S. 696, 698 (2005). The Court held that to satisfy the
"official proceeding" requirement under those subsections,
the Government must show a "nexus" between the
defendant's conduct and a particular proceeding. Id. at 707–
08. To meet that nexus requirement, the Government must
prove that the defendant "ha[d] in contemplation [a]
particular official proceeding" when he or she attempted to
interfere with evidence or a witness. Id. at 708. The
proceeding need not have been pending or about to be
instituted, but it must have been foreseeable. Id. at 707–08.
Thus, the defendant "must believe that his actions are likely
to affect a particular, existing or foreseeable official

23

proceeding." United States v. Kaplan, 490 F.3d 110, 125 (2d Cir. 2007) (citing Arthur Anderson, 544 U.S. at 708).

While the Court in Arthur Anderson interpreted § 1512(b)(2)(A) and (B) only, the Court's analysis and application of the "nexus" requirement applies with equal force to § 1512(b)(1). All three subsections qualify the prohibited conduct by requiring that the defendant target testimony or evidence in an "official proceeding." Consistency demands that we apply the Arthur Anderson nexus requirement to § 1512(b)(1). See United States v. Matthews, 505 F.3d 698, 708 (7th Cir. 2007) (holding that Arthur Anderson applies to prosecutions under § 1512(c)(1) because that subsection also "speaks in terms of the relationship between obstructive acts and a proceeding."); Kaplan, 490 F.3d at 126 (noting that the jury instructions on the § 1512(b)(1) charge "undoubtedly needed to comply with the nexus requirement discussed in Arthur Anderson").

Accordingly, the Government in a § 1512(b)(1) prosecution is tasked with proving that the defendant contemplated a particular "official proceeding" that was foreseeable when he or she engaged in the proscribed conduct. As part of that requirement, the Government must demonstrate beyond a reasonable doubt that the contemplated proceeding met the definition of "official proceeding" articulated in § 1515(a)(1)(A). The VWPA is clear, however, that the Government is not required to show that the defendant knew that the contemplated proceeding was federal in nature:

> In a prosecution for an offense under this section, no state of mind need be proved with

24

respect to the circumstance . . . that the official proceeding . . . is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency . . . .

18 U.S.C. § 1512(g)(1).

The parties dispute whether the United States Supreme Court's recent decision in Fowler v. United States affects our analysis. 131 S. Ct. 2045 (2011). In Fowler, the Court considered the federal nature requirement in § 1512(a)(1)(C), which proscribes the murder of a person with the intent to "prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." The federal prosecution in Fowler arose after Charles Fowler shot a police officer who caught him and his associates suiting up to rob a bank. 131 S. Ct. at 2048. It was clear that Fowler had shot the officer with the intent to prevent him from speaking to other law enforcement officers but that he did not have any specific law enforcement officer or set of officers in mind at the time. To satisfy the federal nexus requirement in such a situation, the Court held, the Government must demonstrate "a reasonable likelihood that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." Id. at 2052 (emphasis in original).

Unresolved is whether the "reasonable likelihood" test set forth in Fowler applies to prosecutions brought under § 1512(b)(1) as well. We decide that question in the negative.

Critically, Fowler was a prosecution under § 1512(a)(1)(C), which, like § 1512(b)(3), is an investigation-related provision aimed at protecting the communication of information to law enforcement. Once again, § 1512(b)(1) is distinct from those provisions because it seeks to protect anticipated testimony in a particular official proceeding. See Byrne, 435 F.3d at 24 ("Unlike [§ 1512] (b)(2) and 18 U.S.C. § 1503, which protect particular 'official proceedings,' [§ 1512] (b)(3) protects the general ability of law enforcement agents to gather information relating to federal crimes . . . ." (citation omitted)). The "reasonable likelihood" standard set forth in Fowler relates to the probability of a victim communicating information to a federal officer, an element required under the investigation-related provisions of § 1512 but not the official proceeding provisions. Thus, by its very nature, the "reasonable likelihood" standard set forth in Fowler is fashioned for the analysis of a materially different offense than the one described in § 1512(b)(1). For the same reasons that the holding in Arthur Anderson does not apply to § 1512(b)(3) offenses and the other investigation-related offenses in the VWPA, it would be illogical to employ the Fowler holding in prosecutions brought under the VWPA provisions that require contemplation of an "official proceeding."

Furthermore, it is difficult to conceive of how we could reconcile the "reasonable likelihood" standard from Fowler with the holding in Arthur Anderson, which requires that the Government prove that the defendant contemplated a particular official proceeding. The Fowler decision addressed a situation in which the defendant did not have in contemplation a particular group of law enforcement officers. Thus, if applied to § 1512(b)(1), the rule set forth in Fowler

26

would directly contradict the Arthur Anderson pronouncement. See Arthur Anderson, 544 U.S. at 708 ("A knowingly corrupt persuader cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." (alterations and quotation marks omitted)). It is telling that the Fowler opinion does not mention Arthur Anderson. If the Supreme Court intended to overrule Arthur Anderson and for all of the VWPA to be governed by Fowler, it presumably would have mentioned Arthur Anderson and explained why. See, e.g., Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000) ("The Court does not normally overturn, or so dramatically limit, earlier authority sub silentio."). Instead, the Court crafted a distinct inquiry for prosecutions under the VWPA provisions that target interference with witness communication to law enforcement officers. This again leads us to the logical conclusion that there are at least two lines of jurisprudence developing separately under the VWPA: one for the investigation-related provisions, such as § 1512(b)(3) and (a)(1)(C), and one for the "official proceeding" provisions, such as § 1512(b)(1) and (b)(2). See Ronda, 455 F.3d at 1288 (observing that the link to a federal proceeding in the investigation-related provisions is less stringent than the "official proceeding" requirement in § 1512(b)(1) and (2)). Hence, we hold that a successful prosecution under § 1512(b)(1) requires proof, beyond a reasonable doubt, that the defendant contemplated a particular, foreseeable proceeding, and that the contemplated proceeding constituted an "official proceeding," as defined by § 1515(a)(1)(A).

B.

27

Applying the above-stated principles, we conclude that the Government's evidence at trial was insufficient to satisfy the "official proceeding" requirement in this case. It is clear from the transcript of the telephone calls that Shavers's and White's efforts were directed at preventing potential witnesses of the speakeasy robbery from testifying at their upcoming hearing in Pennsylvania state court. There is no evidence that they contemplated any other proceeding. In the telephone calls at issue, Shavers and White expressly referred to specific upcoming state court hearings. In his prison phone call on November 12, 2005, for instance, White discussed the speakeasy robbery and who would show up at his upcoming court date. The contemplated court date could only have been a hearing in state court, as the federal prosecution was not initiated until over a year later. On November 14, White mentioned needing someone to show up for court the following day for a "preliminary." JA 2106. In that same conversation, Shavers discussed that he would be going to court the following day. On November 18, White stated that they would be "back to court the 30th." Id. at 2132. Then, in the November 30 conversation, Shavers told the person on the other end of the line that they had gone to court and would go back in three weeks on January 24. Likewise, in the January 9, 2006 conversation, Shavers mentioned that he would be going to court for his "preliminary" on January 24. Id. at 2159. Finally, on September 2, White told the caller that "I got trial on the 18th, I need you to handle somethin' for me[.]" Id. at 2202. All of these conversations demonstrate that Shavers and White had in contemplation specific hearings in state court, not an "official proceeding" as defined by § 1515(a)(1)(A), which, again, requires that the contemplated proceeding be federal in nature. There was no

discussion of any other proceeding nor indication that Shavers and White intended to prevent the witnesses from testifying at a proceeding other than the state court one.[5]

The District Court held that, at the time of the alleged witness tampering, there was "a sufficient basis for one to be put on notice" of the potential for federal prosecution. Id. at 1811. Indeed, there was evidence that Shavers and White were aware that they were subject to a federal investigation by November 18, 2005 at the latest. In connection with the robbery of a post office on November 7, 2005, the FBI initiated an investigation into the overall activities of the group of people associated with Ebony Gist, including Shavers and White. Two weeks after the robberies, postal inspectors and the Philadelphia Police Department executed a search warrant at Gist's home. Postal inspectors also began reviewing the prison telephone calls of Shavers and White. The prison telephone call transcripts reveal that Shavers and White learned on November 18, 2005 (at the latest) that federal agents were investigating them in connection with the post office robbery. Id. at 2130 (Kenneth Ford: "[T]hey got the Feds, SWAT, ramming the houses up in there and all." Shavers: "I heard, man[.]"); id. at 2145 (Darryl Harris: "The law ran into Eb's spot last night." White: "What? The Feds the … boy."). Notwithstanding that evidence, the appellants' knowledge of the post office robbery investigation does not support the Government's case here because the attempts at

---

[5] Shavers was convicted of violating § 1512(b)(1) for telephone conversations occurring on November 14 and 18, 2005 and January 9, 2006. White was convicted of violating § 1512(b)(1) for telephone conversations occurring on November 12 and 18, 2005, and September 2, 2006.

29

witness tampering were so obviously directed at specific state court proceedings and not some other possible proceeding.

Our discussion in United States v. Bell is instructive. 113 F.3d 1345 (3d Cir. 1997). In Bell, Roberta Ronique Bell and several others were accused of murdering Doreen Proctor, who was scheduled to testify against Bell's boyfriend, David Tyler, in his state trial on drug offenses. Id. at 1347. Bell was charged with violating § 1512(a)(1)(A) and (C) (relating to the murder of a witness), and § 1512(b)(1), (2), and (3). Although our discussion of the § 1512(b)(1) charge was limited, we specified that "§ 1512 clearly would not apply if Bell's sole motivation in killing Proctor was to prevent her from testifying at Tyler's trial, because that state-court trial does not qualify as an 'official proceeding.'" Id. at 1349. That is undoubtedly the case here. Even though a federal proceeding was arguably foreseeable in this case, there was no nexus between the possible federal proceeding and the appellants' conduct. Their conduct was unequivocally in contemplation of a state court proceeding.

The Government asserts that this case is similar to United States v. Persico, in which the Court of Appeals for the Second Circuit held that a federal criminal proceeding was foreseeable where the defendant had been informed by the Government that he was the target of a federal investigation. 645 F.3d 85, 108 (2d Cir. 2011). Persico is distinguishable from the case at bar, however. In Persico, there was no pending state criminal proceeding at the time the defendant engaged in witness tampering. Thus, there was no dispute that the particular proceeding contemplated by the defendant was the imminent federal grand jury proceeding. Here, Shavers and White were clearly contemplating their

30

upcoming hearings in Pennsylvania state court, and not any federal proceeding, when they sought to tamper with potential witnesses.

For that reason, we hold that no rational trier of fact could have found the essential elements of a § 1512(b)(1) violation beyond a reasonable doubt. See United States v. Shively, 927 F.2d 804, 811–12 (5th Cir. 1991) (holding that the Government had not produced evidence that the defendant intended to influence an official proceeding because the evidence showed only that he intended to influence the state civil proceedings that he had brought against his insurance agency). As such, we will vacate Shavers's convictions on Counts Five, Six, and Seven, and White's convictions on Counts Four, Six, and Eight.

IV.    The Identification Evidence

The appellants challenge the admission of a number of eyewitness identifications on due process grounds, arguing that they were the result of impermissibly suggestive procedures and were unreliable. After a suppression hearing, the District Court summarily held that the identification procedures used by the police were not unduly suggestive and the identifications were, therefore, admissible. We find no basis for reversal with respect to the identification evidence.

A.

We review the District Court's ruling on the admission of identification testimony for an abuse of discretion. United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006). In reviewing the denial of a motion to suppress, we examine the

31

District Court's factual findings for clear error and review its legal determinations under a plenary standard. Id.

To determine whether an out-of-court identification procedure violated due process, we conduct a two-step inquiry. First, we assess whether the police used an identification procedure that was unnecessarily suggestive. Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012). In answering the question of whether a show-up identification was impermissibly suggestive, "each case must be considered on its own facts." Neil v. Biggers, 409 U.S. 188, 196 (1972) (quotation marks omitted). Even where the police employed an unnecessarily suggestive procedure, however, the identification testimony is not automatically excluded. Perry, 132 S. Ct. at 724. Instead, as a second step, we engage in a case-by-case analysis of whether the procedure gave rise to such a "substantial likelihood of misidentification" that admitting the identification would be a denial of due process. Id. If so, the identification evidence must be excluded. If, on the other hand, "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Id. at 720. Recently, in Perry v. New Hampshire, the United States Supreme Court directed that courts should not reach the reliability inquiry unless the identification resulted from a situation created by improper police conduct. Id. at 728.

## B.

White and Shavers first protest the admission of identifications made by eyewitnesses Brian Anderson and

32

Alberto Vasquez at the scene of the robbery. They argue that the out-of-court "show-up" witness identifications were impermissibly suggestive because the witnesses made the identifications while Shavers and White were handcuffed in police vehicles at the scene of the robbery and bystanders were commenting on the men in the vehicles. The appellants maintain that the on-scene identifications were unnecessary because the police could have just as easily conducted a lineup at the police station, and that they were unreliable because neither witness had an opportunity to observe all of the perpetrators' facial features during the robbery.

We have recognized that a show-up identification procedure of the sort employed here "is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." Brownlee, 454 F.3d at 138; see also Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314 (1987) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned."). Nonetheless, show-up identifications may be necessary when there is an "imperative" need for an immediate identification. Stovall, 388 U.S. at 302. For instance, exigency justified a show-up identification without the presence of counsel in Stovall v. Denno because a key witness was critically injured in the hospital and a show-up identification was "the only feasible procedure." Id.

In United States v. Brownlee, we held that show-up identifications by a number of eyewitnesses in that case were unduly suggestive. 454 F.3d at 138. The police conducted the identifications while the defendant, who was suspected of

33

car-jacking, was handcuffed in the police cruiser at the scene where the stolen car had crashed. The entire scene gave the impression that the police had apprehended the defendant in the stolen car. Exacerbating the suggestiveness were the facts that the defendant was the only suspect shown, the four witnesses made identifications while exposed to each others' influence, and there was no reason why the defendant could not have been taken to the police station for a less suggestive line-up or photo array. Id.

We conclude that the show-up identifications in this case were unnecessarily suggestive. Like in Brownlee, the identifications took place while Shavers and White were handcuffed in patrol cars at the scene of the crime and they were the only suspects shown to the witnesses. Moreover, as in Brownlee, there was a risk here that the witnesses influenced each other. In particular, when the officers pulled up to the robbery scene with the appellants in police vehicles, the eyewitnesses waiting outside of the house approached the patrol car and police van, started pointing at Shavers and White and said "that's the guys that just left out of there." JA 556. Anderson testified that he pointed at the suspects to identify them and he could hear the other witnesses discussing and identifying the suspects. Id. at 555.

The Government proffered no reason why the appellants and witnesses were not taken to the police station for a less suggestive line-up or photo array, or at least down the street for a less suggestive show-up identification. We acknowledge that some exigency existed here because, due to witness reports that the perpetrators were carrying firearms, it was vital to know immediately whether the correct people had been apprehended. See Simmons v. United States, 390 U.S.

34

377, 384–85 (1968) (holding that a show-up identification procedure was not unnecessarily suggestive because "[a] serious felony had been committed[,] [t]he perpetrators were still at large[,] [and it] was essential for the FBI agents swiftly to determine whether they were on the right track . . . ."). It was also important to conduct the identifications while the witnesses' memories were still fresh. See United States v. Funches, 84 F.3d 249, 254 (7th Cir. 1996) ("We have also recognized that immediate show-ups can serve other important interests. For example, show-ups allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." (quotation marks omitted)); United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996) (holding that a show-up identification was not impermissibly suggestive where it took place immediately after the unlawful conduct and was necessary to avoid arresting the wrong person). Despite the urgency at hand, however, the suggestiveness of the identification procedure could have been easily minimized if the officers had parked down the street and brought each eyewitness separately to make an identification.

Although the identifications under these circumstances were unnecessarily suggestive, their presentation to the jury was still appropriate because the circumstances did not create a substantial risk of misidentification. In making that assessment, we take into account the totality of the circumstances. Biggers, 409 U.S. at 196. In Neil v. Biggers, the Supreme Court set forth various factors that aid courts in determining whether an identification was reliable despite a suggestive procedure: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness'

35

degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." Id. at 199–200. In Biggers, the Court held that a show-up identification was reliable despite a suggestive procedure because the victim spent a lot of time in close proximity with her assailant, her description to police was "more than ordinarily thorough," she had "no doubt" that the defendant was the assailant, and she had been presented with a number of previous show-up identification inquiries without making an identification. Id. at 200–01. To warrant the exclusion of evidence, the Biggers factors must indicate a substantial risk of misidentification. The existence of "potential unreliability" alone is not enough to compel exclusion of an identification because there are "other safeguards built into our adversary system" that minimize the risk that a jury will place "undue weight on eyewitness testimony of questionable reliability." Perry, 132 S. Ct. at 728. Those safeguards include cross-examination, the right to effective assistance of counsel, eyewitness-specific jury instructions, the beyond a reasonable doubt standard, and the state and federal rules of evidence. Id. at 728–29.

In Brownlee, we held that the eyewitness identifications were reliable despite law enforcement's use of an impermissibly suggestive procedure. We noted that some facts suggested a risk of misidentification: (1) the abbreviated duration of the car-jacking — only 30 seconds; (2) the victim's testimony that she was predominantly focused on the weapon, not the perpetrator, during the car-jacking; (3) the victim's mistaken account to the police that the perpetrator was a child wearing shorts, when he was

actually a 30 year-old wearing pants; and (4) the generality of the witnesses' descriptions of the perpetrator. Brownlee, 454 F.3d at 140. Despite those concerns, we concluded that the identifications were properly admitted because the witnesses were able to observe the perpetrator at close range, in broad daylight, and for sufficient time; their testimony revealed a substantial degree of attention during the crime; their descriptions were fairly accurate; their degree of certainty was absolute; and only 25 minutes had elapsed between the crime and the eyewitness identifications. Id. We decided that the facts undermining the reliability of the identifications — "[t]he generality of the witnesses' descriptions of the suspect, the relatively short period of time they saw him, and the other shortcomings pertaining to their identifications" — went "more to the weight of the evidence than the reliability of their identifications, and thus were issues for the jury." Id.

Biggers and Brownlee drive our conclusion that Vasquez's and Anderson's identifications did not present a substantial risk of misidentification. With respect to the first Biggers factor, Anderson and Vasquez both had the opportunity, albeit brief, to view the appellants' clothing and faces. On the morning of November 8, 2005, Anderson witnessed three armed gunmen wearing hooded sweatshirts enter Jeanette's residence and order everyone down on the ground. Anderson testified about Shavers that he could see "part of his face," including his nose, mustache, and the top of his forehead. JA 878. Of the other appellants, he testified: "[T]he other one I could see his face. . . . The other one, he had his hood like real loose. I could see his whole face." Id. After the robbery, he recognized the men in the police cars "[b]ecause of their size and their faces. They still had the black hoodies on." Id. at 882.

37

Similarly, Vasquez testified that the three perpetrators wore hooded sweatshirts that did not show their faces and he could see "only like their eyes and maybe their foreheads." Id. at 966. Nevertheless, he was able to identify the man with the shotgun, Shavers, because he unzipped his hooded sweatshirt. Id. at 966–67. He also testified that he was able to see White's face. Id. at 975. When asked to identify the men in the police cars after the robbery, Vasquez recognized them "based on the appearance of their faces and their clothes that they were wearing . . . . They were similar, and facial structures, they had the same faces that I had seen when they took their hoods off, and they were wearing the same clothing and hoodies at the time." Id. at 978–79.

Although the witnesses were only able to view the perpetrators for a short time and could only see parts of their faces, they saw them at close range and were able to give an accurate general description including what the perpetrators looked like and what they were wearing. As we held in Brownlee, the short amount of time in which the witnesses were able to observe the perpetrators and the generality of their descriptions were facts for the jury to consider rather than ones that precluded admission of the identifications. 454 F.3d at 140. Shavers notes that Vasquez inaccurately testified about his weight, stating that he weighed 150 pounds, when 200 pounds was more accurate. An inconsistency such as this, however, is for the jury to consider when they decide how to weigh an identification. See id.

The second Biggers factor also supports the reliability of the eyewitness identifications. The witnesses' testimony illustrates that they were paying close attention to the perpetrators. For instance, they knew the kinds of firearms

38

the perpetrators carried: "Mr. Lewis had a black 9-millimeter or .45 caliber" and "[t]he other gentleman . . . had a nickel-plated pistol." JA 969. The possibility that Anderson and Vasquez were more focused on the firearms than on the perpetrators' faces was another question for the jury, not a reason to surmise that there was a substantial risk of a misidentification as a matter of law. See Brownlee, 454 F.3d at 140.

The third Biggers factor has no bearing on this case because Vasquez and Anderson gave no description of the perpetrators prior to their on-the-scene identifications. The fourth Biggers factor counsels that there was little risk of misidentification here because, like the witnesses in Brownlee, both Anderson and Vasquez testified that they were certain that they had identified the correct men. Furthermore, Vasquez and Anderson both repeatedly corroborated their initial identifications. Later on the day of the robbery, Vasquez recognized White at the prison. Two years after the robbery, Anderson identified Shavers and White when shown separate pictures. Four years after the robbery, Anderson was placed in the same holding cell as Lewis, Shavers, and White where he recognized all three as involved in the robbery. And, at trial, Vasquez and Anderson identified all three appellants.

Finally, the police presented Vasquez and Anderson with the suspects within minutes of the robbery. There is an inherent reliability to an identification made immediately following the witness's confrontation with the suspect because the perpetrator's appearance is fresh in the witness's mind. We articulated that principle in United States v. Gaines, when we held that an on-the-scene show-up

39

identification made immediately following a bank robbery was justified by, inter alia, the inherent reliability of an immediate identification. 450 F.2d 186, 197 (3d Cir. 1971). Similarly, in United States v. Hawkins, another robbery case, the Court of Appeals for the Seventh Circuit held that a show-up identification was reliable, in part, because it was conducted within an hour of the crime. 499 F.3d 703, 710 (7th Cir. 2007).

Scrutiny of the Biggers factors as applied to the facts of this case convinces us that the show-up identifications did not present a substantial likelihood of misidentification. Thus, we hold that the District Court properly permitted the jury to hear testimony about the show-up identifications and the related in-court identifications.

C.

Lewis challenges identifications made by Vasquez and Anderson as well. First, he objects to the admission of Vasquez's identification of him on June 25, 2008 in an eight-person photo array. In viewing the photo array, Vasquez initially stated that he could not decide whether the third perpetrator was Lewis or the person in the fourth photo, a filler. Nevertheless, he later identified Lewis in court at the pretrial hearing and testified that he was 100% sure that the third perpetrator was Lewis after he studied the pictures in the photo array more closely. Lewis maintains that the photo array and in-court identifications by Vasquez should have been suppressed because they were unreliable.

Vasquez's position is unpersuasive. As discussed above, the reliability prong of the due process analysis is only

reached if the court determines that law enforcement used an impermissibly suggestive procedure. See Perry, 132 S. Ct. at 724 ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). Because Lewis has proffered no reason why the photo array was unnecessarily suggestive, there is no basis for finding a due process violation occurred here and we do not reach the reliability inquiry.

D.

Next, Lewis asserts that Anderson's in-court identification of him was the result of an impermissibly suggestive encounter in which Anderson (who was incarcerated) was placed in a United States Marshal's Service holding cell with the three appellants three months before trial.[6] On the day the encounter took place, June 14, 2009, a suppression hearing had been scheduled to occur. When the

---

[6] White states in his brief that he joins Lewis's argument with respect to Anderson's identification. Lewis's brief provides no argument on White's behalf, however. Assessing identification evidence is a predominantly fact-based inquiry and White provides no factual support or argument illustrating why Anderson's identification of him was admitted in violation of due process. White has, therefore, inadequately presented the issue on appeal, See Skretvedt v. E.I. DuPont DeNemours, 372 F.3d 193, 202–03 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.").

hearing was cancelled, the Government decided to conduct a preparatory session with Anderson instead and did not cancel his order of transport from prison to federal court. For an unknown reason, however, the order to transport the appellants to the courthouse was not cancelled and Anderson was inadvertently placed in a holding cell with them. Anderson first recognized Lewis by his face and voice when they were transported from the prison block in an elevator together with two other prisoners (not Shavers and White). When Anderson, Lewis, Shavers, and White were later placed in a holding cell together, Anderson recognized all three appellants as the perpetrators of the robbery. He then identified them at the pretrial hearing and at trial. Lewis moved to suppress Anderson's in-court identification of him on the grounds that Anderson had failed to identify Lewis previously but then recognized him as involved in the robbery after encountering him in the holding cell with the other appellants.

Due to the holding cell mishap, Anderson's in-court identification of Lewis is certainly suspect. In United States v. Emanuele, we dealt with a somewhat analogous incident. 51 F.3d 1123 (3d Cir. 1995). In that case, two witnesses were sitting outside of the courtroom during trial when they observed the defendant walking down the corridor in handcuffs with a Deputy United States Marshal on either side of him. Id. at 1129–30. We declared that the situation was impermissibly suggestive. Id. at 1130. In light of Emanuele, the suggestive nature of the situation in this case is evident. Two years after the robbery, Anderson could not identify Lewis in a photo array. When Anderson saw Lewis in the prison elevator while exiting the prison on a day he knew he was going to testify about the speakeasy robbery, it was

42

natural for him to suspect that Lewis was the third person involved in the robbery. That suspicion was likely confirmed when he and Lewis were then placed in a holding cell with Shavers and White, whom Anderson had already identified. Placing Lewis in an elevator and then a holding cell with a key witness could have and should have been avoided. It is equivalent to allowing a witness to observe a defendant in shackles outside the courtroom.

The Government asserts that placing the four men together was inadvertent. The lack of an improper motive is immaterial, however, because the encounter was still the result of improper conduct on the part of law enforcement. See id. ("We conclude that the confrontation was caused by the government, albeit inadvertently . . . ."). Under Perry, the police must take an active role in creating the suggestive situation before the reliability inquiry is reached. That prerequisite can be gleaned from the Court's use of the active verbs "arrange," "employ," "use," and others throughout the opinion. See Perry, 132 S. Ct. at 724 ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."); id. at 726 ("The Court adopted a judicial screen for reliability as a course preferable to a per se rule requiring exclusion of identification evidence whenever law enforcement officers employ an improper procedure."); id. ("[T]he Court has linked the due process check . . . only to improper police arrangement of the circumstances surrounding an identification."); id. at 726–27 ("[T]he risk of police rigging was the very danger to which the Court responded in Wade when it recognized a defendant's right to counsel at postindictment, police-organized identification procedures."); id. at 727 ("To illustrate the improper

43

suggestion it was concerned about, the Court pointed to police-designed lineups . . . .”). The Court also justified its rule on the basis that the deterrence rationale justifying the exclusion of an identification at trial “is inapposite in cases, like Perry’s, in which the police engaged in no improper conduct.” Id. at 726. Nevertheless, the Court explicitly denied that it was creating a mens rea requirement for the police conduct and maintained that “what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive.” Id. at 721 n.1. Thus, we do not interpret Perry as requiring that the improper police conduct be intentionally aimed at creating a suggestive situation.

This case is distinguishable from Perry, in which the witness had “spontaneously” walked to the window of her apartment building and pointed to Perry “without any inducement from the police.” Id. at 722. Here, the United States Marshal actively placed the appellants and Anderson together. Either the United States Marshal or the Bureau of Prisons was responsible for ensuring that the three appellants would not be housed with a critical witness. The failure of either government entity to do so resulted in an impermissibly suggestive situation.

We arrive at the question of whether Anderson’s identification of Lewis was bolstered by sufficient indicia of reliability despite the unduly suggestive confrontation in the holding cell. Anderson had only a short time to view the perpetrators’ faces at the time of the robbery — maybe 20 seconds. Critically, Anderson testified that Lewis did not have his face covered during the robbery. Anderson appears

44

to have been paying attention because he was able to report accurately that Lewis was wearing a gray hooded sweatshirt and carrying a black automatic handgun.

The strength of Anderson's identification falters upon consideration of the third Biggers factor, the accuracy of his prior description of the suspect. Anderson previously described Lewis as a "black male, approximately 30, 6-feet-3, approximately 225 pounds." JA 563. His description of Lewis at trial was somewhat different — a light-skinned male with a beard. Id. at 533–35, 564. Anderson also told police that he had seen the third perpetrator after the robbery on Germantown Avenue, then later recanted, saying he was mistaken. Id. at 573–75. The inconsistencies evident in Anderson's testimony call into question the reliability of his identification of Lewis.

The fourth Biggers factor also warns of a risk of misidentification because four years passed between the robbery and Anderson's identification of Lewis in the holding cell. In the meantime, Anderson failed to identify Lewis in a photo array two years after the robbery. Emanuele is once again instructive. 51 F.3d at 1129–30. In Emanuele, like here, the witnesses benefited from an unobstructed view of the perpetrators during the bank robbery. The second prong of the identification due process analysis, reliability, turned on whether the witnesses had previously made an accurate identification of the defendant and, therefore, had independent grounds for making identifications at trial. Id. at 1131. Despite the witnesses' adequate opportunity to view the perpetrators during the crime, the first witness's failure to identify the defendant in a photo array prior to the suggestive encounter undermined the reliability of her in-court

45

identification and revealed a substantial risk of misidentification. Id. The in-court identification of the other witness, however, was permissible because she had previously identified the defendant in a photo array. Id. Anderson's previous failure to identify Lewis before seeing him with the other appellants in the holding cell before trial leads us to conclude that the risk of misidentification was substantial. For that reason, Anderson's identification of Lewis should not have been admitted at trial.

We conclude, nonetheless, that the admission of Anderson's identification was harmless error. Under the harmless error test for constitutional violations articulated in Chapman v. California, the Government must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. 18, 24 (1967). "[T]he relevant question under Chapman is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Virgin Islands v. Martinez, 620 F.3d 321, 337 (3d Cir. 2010) (quotation marks omitted). In deciding whether to exercise the Court's discretion to consider an error to be harmless, "the controlling considerations are the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court." United States v. McLaughlin, 126 F.3d 130, 135 (3d Cir. 1997) (quotation marks omitted), abrogated on other grounds by United States v. Fiorelli, 133 F.3d 218 (3d Cir. 1998).

In light of the overwhelming evidence against Lewis in this case, we conclude that the error was harmless and does not compel reversal. Another eyewitness, Vasquez, was absolutely certain about his identification of Lewis as the third robber. Furthermore, Sheronda Gaskin testified that Lewis was with Shavers and White at Ebony Gist's house the night before the robbery when a fourth man told them of a house in Jeanette's neighborhood that had a lot of money. JA 1430, 1441. Gaskin observed the three appellants "get prepared to rob the house" by donning hooded sweatshirts and masks, and "loading up their guns." Id. at 1431. The following morning, Lewis arrived at Gist's home with bruises and "was telling everybody how he got away." Id. at 1435. He explained to Gaskin that "they had tried to rob the house" and that "he went out through the back." Id. at 1436. In a telephone conversation on November 18, 2005, White warned Lewis that the authorities were searching for him and to "keep a low profile." Id. at 2136. Later in the conversation, Lewis and Shavers discussed how Lewis had escaped after the robbery. Id. at 2139. We are convinced that there was ample evidence in the record of Lewis's culpability such that the erroneous admission of Anderson's identification of Lewis was harmless error beyond a reasonable doubt.

E.

Finally, White appeals the denial of his motion to suppress Rickey's identification of him at the police station, in a lineup, and in court on the basis that Rickey did not have sufficient opportunity to see White's face at the speakeasy. White's challenge to Rickey's identification is unsuccessful because he does not explain why any of the procedures used by law enforcement were unnecessarily suggestive. In

47

addition, Rickey's identification at the police station is unchallengeable under Perry because he identified White on his own accord, without prompting by the police. See 132 S. Ct. at 728. For these reasons, the District Court did not abuse its discretion in admitting Rickey's identifications of White.

## V. Prison Telephone Conversations

Lewis challenges the District Court's denial of his pretrial motion to suppress a telephone conversation recorded at the prison on November 15, 2005 between Lewis, who was not imprisoned at the time, White, and others. Lewis argues that recording the call violated his Fourth Amendment right to be free of unreasonable searches because he was unaware that the call would be recorded and, thus, he had a reasonable expectation of privacy in the call.

We review the District Court's decision to admit evidence for an abuse of discretion. United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment protections are not triggered unless the state monitors an area in which the defendant has a "constitutionally protected reasonable expectation of privacy." New York v. Class, 475 U.S. 106, 112 (1986). Determining whether an individual's expectation of privacy is justifiable under the Fourth Amendment involves two inquiries: "(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances." Free

Speech Coal., Inc. v. Att'y Gen., 677 F.3d 519, 543 (3d Cir. 2012).

Under the specific circumstances presented in this case, Lewis did not have an objectively reasonable expectation of privacy in his telephone conversation with White. Lewis knew where White was incarcerated when White called Lewis, as he had agreed to send Shavers and White mail there. Furthermore, Lewis was previously incarcerated at the same prison. Thus, he would have received a handbook alerting him that all telephone calls were recorded and been exposed to a document hanging in the common areas that notified prisoners that their calls might be monitored and recorded. In these circumstances, Lewis should have known that all outgoing prisoner telephone calls were monitored and recorded. See United States v. Sababu, 891 F.2d 1308, 1329 (7th Cir. 1989) (holding that a non-prisoner had no reasonable expectation of privacy when speaking to a prisoner on the telephone because, as a frequent visitor to the prison, she was "well aware of the strict security measures in place" and that the Code of Federal Regulations puts the public on notice that prison officials are authorized to monitor prisoners' telephone calls); United States v. Harrison, 986 F. Supp. 280, 281–82 (M.D. Pa. 1997) (observing that the defendant had no subjective expectation of privacy because it was clear from the content of the telephone calls and his guarded language that he knew he was speaking with a prisoner and that the calls would be monitored). We hold, therefore, that Lewis's Fourth Amendment challenge to the admission of the telephone call transcript is unavailing.[7]

[7] The Government devotes much of its brief to arguing that the recording of Lewis's conversation was not a

49

## VI.    The Post Office Robbery Evidence

All three appellants assert that the District Court erred in permitting the Government to introduce evidence that they were involved in the uncharged armed robbery of a post office. Although the Government had originally moved to admit more details about the post office robbery investigation, the evidence elicited at trial was essentially limited to the following facts. Approximately twelve hours prior to the speakeasy robbery, at 6:30 p.m. on November 7, 2005, a post office was robbed in West Philadelphia. Postal Inspector Kathleen Brady testified that on November 17, 2005, postal inspectors executed a search warrant of Gist's house based on information that the post office robbery had been committed by people staying there. Investigators also began inquiries

_____

violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits the interception of "any wire, oral, or electronic communication," including telephone conversations. 18 U.S.C. § 2511(1). We need not delve into that topic, however, because Lewis does not claim a violation of that Act.

White also states in his brief, without argument, that he joins Lewis's challenge to the prison telephone call. White's challenge is unconvincing, however, as he engaged in other calls from the prison prior to the November 15 call during which he was specifically warned that prison telephone calls might be monitored and recorded. JA 2114. For the reasons stated above, prisoners do not have a reasonable expectation of privacy when speaking on a prison telephone, especially where a warning has been given.

into the people who spent time at Gist's house, including Lewis, Shavers, and White. The search produced a cellular phone belonging to a customer from the speakeasy. Postal inspectors also subpoenaed Shavers's and White's recorded prison telephone calls and visitor logs in connection with the investigation.[8] The Government also offered Gist's testimony that, on the night of the post office robbery, four individuals ran into her house and hid in her back room from a helicopter that was scanning the area. The next morning, four men, including Lewis, were in her house and one of the men (not Lewis) was counting money. Gist testified that a neighbor stopped by later and told "Snoop" (Kenneth Ford) that he was a suspect in the post office robbery.

We review the District Court's decision to admit evidence for abuse of discretion, meaning that "we must uphold the District Court unless its ruling was arbitrary or irrational." United States v. Green, 617 F.3d 233, 239, 251–52 (3d Cir. 2010) (quotation marks omitted). Federal Rule of Evidence 404(b) limits the admission of evidence of other crimes, wrongs, or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. The "threshold inquiry a court must make before admitting similar acts

---

[8] White claims that the transcripts of prison telephone calls that were admitted into evidence in this case implicated the three appellants in the post office robbery. There is no mention of the post office robbery in those transcripts, however.

evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." Huddleston v. United States, 485 U.S. 681, 686 (1988). We have long considered Rule 404(b) to be inclusionary such that "evidence of other wrongful acts was admissible so long as it was not introduced solely to prove criminal propensity." Green, 617 F.3d at 244.

For similar act evidence to come in under Rule 404(b), there must be "(1) a proper evidentiary purpose; (2) relevance under Rule 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Rule 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used." United States v. Butch, 256 F.3d 171, 175 (3d Cir. 2001). Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Pursuant to Federal Rule of Evidence 403, we must also consider whether the probative value of the evidence is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Applying this framework, we conclude that the District Court did not abuse its discretion in allowing in the limited evidence concerning the post office robbery. First, evidence of the ongoing investigation into the post office robbery was relevant and was offered for proper evidentiary purposes. Inspector Brady's testimony about the post office robbery investigation was critical to the witness tampering allegations because the Government was attempting to prove that Shavers and White were being investigated by federal

authorities and that a federal criminal proceeding was foreseeable.[9]  Under Rule 404(b), it is permissible to admit evidence that shows the defendant's knowledge of a key fact. Inspector Brady's testimony was also necessary to admit another critical piece of evidence against Lewis — the presence of both Lewis and a speakeasy customer's cell phone at Gist's residence the day after the speakeasy robbery. Finally, the evidence explained the references to a federal investigation in the prison telephone calls and why Shavers, White, and Lewis were being investigated.  Providing background information of that sort is a proper evidentiary purpose.  See Green, 617 F.3d at 250 ("Here, evidence of Green's threat was admissible as background information which completed the story of the crime.  It explained why Green was under investigation, why Stahl agreed to serve as an informant, and the references to A.G. in their conversations.").

Second, to the extent that the jury could have gleaned any inference that the appellants were involved in the post office robbery due to their association with Gist, we agree with the District Court that the probative value of the disputed evidence was not "substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The evidence did not speak to the appellants' character because there was no proof that the appellants had committed the post office

---

[9]  The fact that we ultimately hold that the Government did not meet its burden on the witness tampering count does not change our view that the admission of this evidence at trial had a proper purpose.

53

robbery. Proof that they were being investigated alone is substantially less prejudicial than evidence of the commission of a crime. The possible prejudicial effect of the post office robbery evidence, therefore, did not substantially outweigh its probative value. See United States v. Jones, 566 F.3d 353, 365 (3d Cir. 2009) (holding that evidence of violent crimes and other illegal activities of defendant's gang was not unduly prejudicial because defendant "was not directly implicated" and the evidence was probative of elements of the crimes that the defendant was charged with).

The appellants claim that the disputed evidence here is analogous to the erroneously admitted evidence in United States v. Murray, 103 F.3d 310 (3d Cir. 1997). In that case, we held that evidence that the defendant had committed an uncharged murder should not have been presented to the jury because it was extremely prejudicial and irrelevant. Id. at 317–18. The prejudicial nature of the evidence in this case, where there is merely the possibility that the appellants or their associates were involved in another crime, is far less than in Murray, which involved evidence that the defendant had actually committed another murder. Moreover, unlike the evidence in Murray, the evidence in this case was relevant and was offered for a proper evidentiary purpose.

Finally, the District Court's failure to give a limiting instruction addressing this evidence was not reversible error because there is no indication in the record that defense counsel requested one. See Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 526 (3d Cir. 2003) (holding that the defendant had waived any challenge to the district court's failure to give a limiting instruction addressing Rule 404(b) evidence by failing to request one at trial or raise

54

the issue on appeal); <u>United States v. Multi-Mgmt., Inc.</u>, 743 F.2d 1359, 1364 (9th Cir. 1984) ("It is well-settled that where no limiting instruction is requested concerning evidence of other criminal acts, the failure of the trial court to give such an instruction <u>sua sponte</u> is not reversible error."). Even if there had been such a request, however, the lack of a limiting instruction would be harmless error, given the extent to which the probative value of the disputed evidence outweighs its negligible prejudicial effect. We will, therefore, affirm the District Court's admission of the post office robbery evidence.

## VII. Statement by Witness Sheronda Gaskin

The three appellants next challenge the District Court's refusal to declare a mistrial after an outburst by Government witness Sheronda Gaskin. On redirect, Gaskin declared:

> Having me testify right here, like I'm afraid for my life. By me saying what I said in this courtroom today, there's no way possible I can stay in Philadelphia. Like that's a known fact right there. That's a given, like. For a fact, I know G Bucks [Shavers] is a killer.

JA 1514. After the outburst, the District Court excused the jury for lunch. When they returned, the Court issued a cautionary jury instruction, stating:

> I am directing, ladies and gentlemen, that you are to disregard the answer and the question posed to the witness prior to your recess. You are not to consider the response or the question

55

in any form or way as it relates to any one of these three defendants. It has no relationship to anything that is charged in this superseding indictment in this case . . . . I further instruct you that no one can mention that testimony or that question during any portion or course of the deliberations in this case.

Id. at 1524–25. The Court also reiterated in its jury instruction at the end of the trial that the jury must disregard evidence that had been stricken by the Court. Id. at 1981. Shavers moved for a mistrial, which the Court denied because, although the "prejudice [was] significant," it did not deprive Shavers of the right to a fair trial in consideration of the totality of the evidence. Id. at 1518, 1521–22, 2040–41.

We review the denial of a motion for a mistrial based on the admission of allegedly prejudicial evidence for abuse of discretion. United States v. Lore, 430 F.3d 190, 207 (3d Cir. 2005). We are concerned with whether the statement was so prejudicial that the appellants were deprived of the fundamental right to a fair trial. United States v. Xavier, 2 F.3d 1281, 1285 (3d Cir. 1993). Three factors guide our analysis of Gaskin's inappropriate outburst: "(1) whether [the] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court." Lore, 430 F.3d at 207.

In Lore, a prosecution for embezzlement, a witness blurted out, "You have to ask [one of the defendants]. She handled the checkbook." Id. at 207. We held that a curative instruction was sufficient because the statement was dwarfed

by the witness's five days of testimony, and thus was not pronounced or persistent, and there was strong evidence of the defendant's culpability. Id. Similarly, in United States v. Riley, a witness twice mentioned that he had met the defendant in a work release program, which impermissibly informed the jury that the defendant had been convicted of a previous crime. 621 F.3d 312, 336 (3d Cir. 2010). We held that the remarks were not pronounced or persistent because they were two remarks in the course of three days of testimony in a five-week trial. Id. Moreover, there was significant evidence of guilt such that "there [was] no question that the jury did not solely rely upon the fact that [defendant] was on work release." Id. at 337. Finally, the Court gave a curative instruction in the jury instructions at the end of the trial. Id.

The context of the remarks and the other Lore factors drive the analysis, rather than the number of prejudicial remarks. We have declared a mistrial on the basis of solitary prejudicial remarks. In United States v. Carney, the defendant's coconspirator, John Blandford, testified that the defendant, who was on trial for a fraud-related conspiracy, had "tried to kill myself and my two children." 461 F.2d 465, 466 (3d Cir. 1972). The District Court ordered the testimony stricken and instructed the jury not to consider the question or answer. We vacated the conviction, holding that the only remedy was a mistrial because the prejudice was "obvious" and Blandford's testimony was essential to the Government's case. Id. at 466–68. Other factors relevant to our determination were the lack of overwhelming evidence of guilt, the statement's lack of impeachment value or relevance, the fact that the prosecutor elicited the testimony by asking an

57

"obviously risky question" on direct examination, and the defendant's prompt motion for a mistrial.  Id. at 468.

In United States v. Gray, the defendant, who was charged with bank robbery, testified and volunteered that he had previously been "locked up waiting trial on my wife's death" and that his "wife was killed."  468 F.2d 257, 258 (3d Cir. 1972) (en banc).  In response, the prosecutor asked: "You killed her, didn't you?"  Id. at 259.  The District Court sustained the defense's objection to the question and instructed the jury to ignore the testimony and strike it from their minds.  Id.  We held that a mistrial should have been granted because the prosecutor's question was "grievous plain error" and "[n]o cautionary instruction could purge the jury's mind and memory of the devastating impact of the question."  Id.

Gaskin's statement, although inappropriate, does not rise to the level that would compel a mistrial.  Her statement, a single, isolated comment in the course of a six-day trial, was not as "pronounced and persistent" as the remarks in Carney and Gray.  The statements in Carney and Gray were much more specific than in this case because they identified specific incidents and victims.  Additionally, Gaskin's testimony had already been undermined because she admitted to having committed perjury before the grand jury.  Thus, the first Lore factor does not persuade us that a mistrial was appropriate.

The second Lore factor also counsels against declaring a mistrial.  There was considerable evidence of Shavers's culpability including, inter alia, his arrest within minutes and blocks of the robbery, which took place at 5:30 a.m., an unusual hour to be running down the street; Vasquez's and

58

Anderson's identifications of Shavers immediately following the robbery and later in court; Shavers's possession upon arrest of shotgun shells combined with witnesses' testimony that one of the men at the robbery was carrying a shotgun; Gaskin's testimony that Shavers and White were discussing a house with lots of money the night before the robbery and then left Gist's house shortly before the robbery armed with firearms; and the prison telephone calls in which Shavers discussed being present at Jeanette's during the robbery. The substantial evidence of Shavers's guilt in this case far overshadows Gaskin's comment.

With respect to the third Lore factor, the District Court gave a strong curative instruction following Gaskin's comment and then another in the final instructions. "A jury is ordinarily assumed to follow clear instructions from the trial judge." Carney, 461 F.2d at 467. While we acknowledge the prejudicial nature of Gaskin's outburst, given the evidence in the case and the curative instructions, we are confident that the statement was not so prejudicial as to deprive Shavers of a fair trial. The District Court did not abuse its discretion in denying Shavers's motion for a mistrial.[10]

## VIII.   The Confrontation Clause

White maintains that the District Court violated his right to confrontation by admitting Gist's testimony about a

---

[10]   White and Lewis both join this claim for relief but do not explain how Gaskin's statement was prejudicial with respect to them. Nonetheless, we are satisfied that any minimal prejudice that Gaskin's statement had on White or Lewis was easily cured by the Court's two instructions.

statement that Lewis made to her that implicated White and Shavers in the robbery. Gist testified that Lewis and others used to spend time at her home. On the morning of the speakeasy robbery, she came downstairs and found Lewis and three other men in her home. One of the men, not Lewis, was counting money. Lewis related to Gist that he had injured his forehead while hiding under a children's pool the night before. When asked whether Lewis divulged what he had been doing that night, Gist testified that Lewis "didn't say exactly what he was doing, but he just stated that F [referring to White] and Butts [referring to Shavers] had got locked up. They had got caught trying to rob, I think a speakeasy or something." JA 1308. White argues that Gist's testimony about Lewis's statement violated his right to confrontation under the Sixth Amendment.

Because the appellants did not raise a Confrontation Clause objection to this evidence in the District Court, it is reviewed for plain error. United States v. Richards, 241 F.3d 335, 341–42 (3d Cir. 2001). To satisfy the plain error standard, the defendant must prove that there was (1) an error; (2) that is plain, i.e., obvious under the law at the time of review; and (3) that "affect[s] substantial rights." Johnson v. United States, 520 U.S. 461, 467–68 (1997). If those conditions are met, we may exercise our discretion to order correction, but only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 467. An error is considered to have affected substantial rights when it "'affected the outcome of the district court proceedings.'" United States v. Vazquez-Lebron, 582 F.3d 443, 446 (3d Cir. 2009) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)).

60

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In the wake of the Supreme Court's decisions in Crawford v. Washington, 541 U.S. 36 (2004) and Davis v. Washington, 547 U.S. 813 (2006), we have held that a witness's statement implicates the Confrontation Clause only if it is testimonial. United States v. Berrios, 676 F.3d 118, 126 (3d Cir. 2012). Under Bruton v. United States, using a non-testifying codefendant's confession violates a defendant's rights under the Confrontation Clause. 391 U.S. 123, 127–28 (1968). Critically, we have asserted that, "because Bruton is no more than a by-product of the Confrontation Clause, the Court's holdings in Davis and Crawford likewise limit Bruton to testimonial statements." Berrios, 676 F.3d at 128.

In view of our holding in Berrios, we conclude that Gist's testimony did not contravene White's Confrontation Clause rights. In Berrios, we considered a conversation between Reinaldo Berrios and one of his codefendants, Troy Moore, that was recorded as part of an unrelated investigation. Id. at 124. The conversation incriminated Berrios, Moore, and a third codefendant, who challenged admission of the recorded conversation on Confrontation Clause grounds. Id. at 125. We held that the recorded statements bore "none of the characteristics exhibited by testimonial statements" because there was no evidence that Berrios and Moore intended to incriminate their codefendants, that they were aware that their conversation was being recorded, or that "their conversation consisted of anything but 'casual remark[s] to an acquaintance.'" Id. at 128 (quoting Crawford, 541 U.S. at 51). The attributes of a

61

testimonial statement are lacking here as well. There is no indication or argument that Lewis intended to incriminate Shavers and White or anticipated that Gist would be called to testify against them. Nor is there any suggestion that the conversation amounted to more than simply a "casual remark to an acquaintance." Id. Finally, Gist's casual elicitation of Lewis's remarks bears no resemblance to the abusive governmental investigation tactics that the Sixth Amendment seeks to prevent.[11] Thus, we are satisfied that the admission of Lewis's statements does not compel reversal of the appellants' convictions.

## IX.     The Mandatory Minimum Sentences Under 18 U.S.C. § 924

We turn to the argument, joined by all three appellants, that the District Court's imposition of the seven-year mandatory minimum sentence pursuant to 18 U.S.C. § 924(c)(1)(A)(ii) was unconstitutional without a finding by the jury that the appellants brandished firearms during the robbery. While the appellants acknowledge that Supreme Court precedent forecloses relief on this claim, they raise the issue to preserve it for future review.

We exercise plenary review over allegations of constitutional violations in sentencing. United States v. Lennon, 372 F.3d 535, 538 (3d Cir. 2004). The appellants were convicted under 18 U.S.C. § 924(c)(1)(A), which

---

[11]  Shavers originally made this argument as well but has since submitted a letter to the Court pursuant to Federal Rule of Appellate Procedure 28(j) stating that he no longer seeks relief on this ground in light of our decision in Berrios.

imposes a mandatory minimum sentence of seven years in addition to the punishment for the underlying crime on a perpetrator who brandishes a firearm "during and in relation to" any federal crime of violence. The verdict form tasked the jury with deciding whether the appellants had used or carried firearms during and in relation to the robbery. The jury found in the affirmative. At sentencing, the District Court found by a preponderance of the evidence that the appellants had not only carried, but brandished firearms during the robbery. Accordingly, the Court included the seven-year mandatory minimum set forth in § 924(c)(1)(A)(ii) in the appellants' sentences. The appellants argue that the seven-year minimum sentence cannot be constitutionally imposed without a finding by the jury beyond a reasonable doubt that they brandished firearms, and that the lower burden of proof applied by the District Court violated their right to due process under the Fifth Amendment and their right to a jury under the Sixth Amendment.

In support of their argument, the appellants rely on Apprendi v. New Jersey, in which the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The Supreme Court has held, however, that "brandishing" a firearm is a sentencing factor and not an element of the crime described in 18 U.S.C. § 924(c)(1)(A). Allowing the judge to find that factor by a preponderance of the evidence does not violate a defendant's Fifth and Sixth Amendment rights. Harris v. United States, 536 U.S. 545, 556 (2002). The Supreme Court in Harris v. United States explained that the

63

"brandishing" provision does not violate the <u>Apprendi</u> rule because the mandatory minimum provisions in § 924 do not extend a defendant's sentence beyond the statutory maximum sentence, which is "well in excess of seven years." <u>Id.</u> at 554, 567–68; <u>see also</u> <u>United States v. Shabazz</u>, 564 F.3d 280, 288–89 (3d Cir. 2009).

Harris remains good law and has been subsequently relied upon and cited by the Supreme Court and this Court. <u>See, e.g.</u>, <u>United States v. O'Brien</u>, 130 S. Ct. 2169, 2179–80 (2010); <u>United States v. Tidwell</u>, 521 F.3d 236, 245 (3d Cir. 2008).[12]  Given that the Supreme Court squarely addressed

--------

[12] Shavers argues that the Supreme Court's opinion in <u>Cunningham v. California</u>, undermines its reliance in <u>Harris</u> on the traditional role of the sentencing court in fact-finding. 549 U.S. 270, 289, 293 (2007).  In <u>Cunningham</u>, the Court reversed the California Supreme Court's holding that California's determinate sentencing law did not contravene the Sixth Amendment.  The Court rejected the California court's pronouncement that the law "simply authorize[s] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." <u>Id.</u> at 289. <u>Cunningham</u> is distinguishable from <u>Harris</u>, however, because the California statute provided three levels of fixed sentence terms at six, twelve, and sixteen years of imprisonment. <u>Id.</u> at 275.  The California statute violated <u>Apprendi</u> because it allowed the court, by finding additional facts by a preponderance of the evidence, to enhance a sentence into a tier higher than that justified by the jury's finding.  To the contrary, the sentencing enhancements in § 924 do not dictate a sentence above the maximum

this issue in <u>Harris</u> and held that brandishing is a sentencing factor to be found by the judge, the appellants' argument does not provide a basis for reversal.

## X.  Shavers's Term of Supervised Release

Finally, Shavers contends that his eight-year term of supervised release exceeds the statutory maximum of five years for a violation of 18 U.S.C. § 924(c)(1)(A)(ii).  For a felony conviction pursuant to § 924(c), which is a Class A felony, the maximum length of supervised release is five years.  18 U.S.C. §§ 3559(a)(1), 3583(b)(1); <u>United States v. Cudjoe</u>, 634 F.3d 1163, 1166 (10th Cir. 2011); <u>United States v. Todd</u>, 521 F.3d 891, 895 (8th Cir. 2008).  Shavers is correct, therefore, that his sentence of eight years of supervised release exceeds the statutory maximum term of supervised release for the offense of conviction.  Because that constitutes plain error, we will vacate Shavers's sentence and remand to the District Court for resentencing.  <u>See</u> <u>United States v. Cole</u>, 567 F.3d 110, 118 (3d Cir. 2009) ("Our precedent is clear that a plainly erroneous condition of supervised release always affects a defendant's substantial rights.").[13]

---

sentence for the offense as found by the jury.  The Court dealt with a different statutory structure in <u>Cunningham</u> and, therefore, that case does not provide support for overruling <u>Harris</u>.

[13] Although Lewis joins this argument, his term of supervised release was five years and he has no basis for this claim.

65

## XI.

In accordance with the foregoing, we will vacate Shavers's eight-year term of supervised release and Shavers's and White's witness tampering convictions. We will uphold the convictions of all three appellants on all other counts and affirm Lewis's sentence. We will remand for the resentencing of Shavers and White in accordance with this opinion.